[Crim. No. 8547. In Bank. Jan. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. LEAMAN RUSSELL SMITH, BARBARA RUTH WALKER and DONALD E. CASTNER, Defendants and Appellants.

Burton Marks and George V. Denny III, under appointment by the Supreme Court, and Erling J. Hovden, Public Defender, Wilbur F. Littlefield and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

784

MOSK, J.—Defendants Leaman Smith, Barbara Walker, and Donald Castner appeal from judgments entered upon jury verdicts finding them guilty of conspiracy to commit forgery and burglary (Count I), the murder of Charles Monaghan (Count II), the murder of Robert Endler (Count III), the attempted murder of Stephen Suzuki (Count IV), and the attempted murder of Endel Jurman (Count V). The jury found the murders to be of the first degree, and fixed the penalty therefor at life imprisonment for Mrs. Walker and Castner, and death for Smith. The appeal of the latter is automatic. (Pen. Code, § 1239, subd. (b).)[1]

During the two months preceding February 1, 1964, Smith arranged for the printing of large numbers of blank checks purportedly issued by the Colgate-Palmolive Company and the Alka-Seltzer Miles Laboratories Company. With the assistance of Castner and Anderson, Smith placed false account numbers on the checks by a silk-screen process, made the checks payable to fictitious payees, signed them with the names of fictitious makers who were purportedly authorized officers of the issuing companies, prepared fictitious driver's licenses appearing to identify Smith as the person named as payee, and cashed a number of these checks at stores in the Los Angeles area.

In the late afternoon of February 1, 1964, Smith and Mrs. Walker left the house where they lived together, and proceeded to drive along West Pico Boulevard and nearby streets. Smith attempted with mixed success to cash fraudulent Alka-Seltzer checks at eight or nine liquor stores and food markets on the way. When the owner of one of the liquor stores refused to cash a check that Smith had presented, Mrs. Walker said, "Why don't you cash that check, it's a good check."

About 8:15 p.m. Smith and Mrs. Walker arrived at the Sears, Roebuck store on West Pico Boulevard. They went to the cashier's department and Smith presented one of the Alka-Seltzer checks to be cashed, together with a fictitious

[1] A fourth defendant, Dennis Anderson, was originally charged in all five counts; his motion to dismiss for lack of probable cause (Pen. Code, § 995) was granted as to each count except Count I (conspiracy), and he obtained a severance.

Count VI of the indictment charged a fifth defendant, Clifford Phillips, with being an accessory after the fact (Pen. Code, § 32). In the course of trial, however, the court ruled that a corpus delicti of the charge against him had not been proved, and hence testimony of his statements to the police were inadmissible. The court then granted the People's motion to dismiss as to Phillips for the purpose of calling him as a witness for the prosecution. (Pen. Code, § 1099.)

driver's license purporting to identify him as the payee, "Thomas B. Conway." On turning the license over, the cashier's suspicions were aroused when she found it did not have the usual seal of the State of California stamped on the reverse side. A call went out for the store security officer, Mr. Winters; while awaiting his arrival, the cashier explained the delay to Smith by pretending that the check was being cleared through Telecredit. Smith stated that he "couldn't wait that long," but the cashier retained the check and license and reported that the Telecredit line was busy. Mr. Winters then arrived, and out of the presence of Smith and Mrs. Walker the cashier gave the check and license to him and explained her reasons for believing they were not genuine.

At Mr. Winters' request, Smith and Mrs. Walker accompanied him to an inner office. He asked Smith if he had any further identification, and Smith said he did not. Smith then stated he wanted the check and license returned to him and wanted to leave. Mr. Winters replied he would first have someone examine the check and license; in the presence of Smith and Mrs. Walker, Mr. Winters telephoned the Wilshire Detective Bureau, located next door to Sears, and asked that a detective be sent over.

A few minutes later Police Officers Monaghan, Endler, and Jurman, all in plain clothes, arrived in the office. Mr. Winters showed them the check and license and told them he suspected they were not genuine. Smith asked the officers, "Are you cops?" and Officer Endler answered, "Yes." Smith and Mrs. Walker appeared to speak to each other, but their words were inaudible to the others present.[2] The police officers then separated Smith and Mrs. Walker, conducting the latter to a chair in the outer office. Mr. Winters attempted to reach Telecredit to verify the check, when Smith suddenly drew a gun from under his coat. Officer Monaghan shouted, "Look out, he has a gun," and a shot rang out. Mr. Winters and the officers ducked, and Smith stood waving his gun and saying, "Get out of my way, I'm coming through" or "I'm coming out." Officer Endler had been shot point-blank in the head; when found after the shooting, his gun was still in its holster. Officer Monaghan drew his gun and pushed Mr. Winters, who

---

[2] Smith testified that he asked Mrs. Walker, "Are you ready?" Mrs. Walker denied this on the witness stand; she testified, rather, that he asked her to give him the gun she had in her purse and that she refused to do so despite his repeated urging.

was unarmed, behind him on the floor. Mr. Winters' view was then blocked, but he heard another shot and saw Officer Monaghan bleeding profusely from the head. Officer Jurman attempted to stop Smith, but Smith shot him in the chest and arm. At some point in this melee Smith also fired in the direction of two employees crouching by a counter and wounded one, Mr. Suzuki. Smith then ran out of the office and down a main aisle of the store, brandishing his gun and shouting, "Don't move, anybody, don't move." He left via the parking lot and escaped in his car.

Additional police arrived on the scene and found Officers Monaghan and Endler dead from gunshot wounds of the head, and Officer Jurman and employee Suzuki alive but suffering from other gunshot wounds. Throughout the shooting and escape Mrs. Walker had remained seated in the chair where she had been placed earlier. Officer Bradshaw took possession of her purse, opened it and found a loaded .25-caliber pistol in a holster. Officer Bradshaw then arrested and handcuffed Mrs. Walker, and turned her over to Officer Sinclair, his superior. A further examination of Mrs. Walker's purse disclosed a driver's license in her wallet with her photograph on it but issued to the name "Barbara J. Snyder," and scraps of paper bearing the names and addresses of defendants Castner and Anderson. In a separate, zippered compartment of the purse were found four other driver's licenses, each bearing the same photograph of Smith but issued to a different fictitious name and address; six forged Alka-Seltzer checks; and a driver's license and social security card in a fictitious name ("Larry Parker") previously used by Smith in passing the Colgate-Palmolive checks.[3]

After leaving the Sears parking lot Smith abandoned his car on a side street and took a taxi to a bar, where he telephoned Castner. Phillips, who lived with Castner, testified that the latter answered the call about 9:15 p.m., and became "visibly shook and nervous." After hanging up, Castner ran around the apartment pouring photographic solutions down the drain and packing other equipment, including an enlarger, into Phillips' car. They drove to the bar and had a round of drinks with Smith, then all three returned to Phillips'

[3] With Mrs. Walker's consent the police then went to the house where she and Smith lived together, and found further evidence of Smith's identity and of check forging operations. The circumstances surrounding this search and seizure will be discussed more fully at the appropriate point below.

car. As they entered Smith said, "Turn on the radio, I have shot someone." They heard a news broadcast stating that two policemen had been killed at the Sears store and two persons had been wounded. Smith told Phillips and Castner that he and Mrs. Walker had gone into Sears to cash a check and there had been "some trouble." At Smith's direction they drove to an alley and dumped the equipment into a trash can, then continued to the railroad freight yard where Smith left them. Phillips and Castner drove on to the apartment of a friend, Johnny Holloway; the three went to a bar, and Castner told Holloway that if anyone should ask, they had been with him all evening. Smith was arrested in Chicago on a fugitive warrant four days later, still in possession of the gun that had been used to kill Officers Monaghan and Endler.

Mrs. Walker testified in her own defense. She was five or six months pregnant at the time of trial, had three children by a prior marriage, and was 21 years old. Her schooling had not progressed beyond the sixth or seventh grade, and she could barely read or write. Smith met her in Chicago where she was working as a waitress, and brought her to California in the middle of January 1964. Through Smith she met Castner and Phillips, but she had never seen Anderson until he appeared in court. Smith told her to call him "Jim Snyder," and to describe him as a sales promotion man for Colgate-Palmolive. He told her he carried a gun for protection because he often had large amounts of money on his person. He told her that the various checks he cashed were his own pay checks, and she had no knowledge that they were fictitious. She had no part in preparing any of the checks involved in this case, and Smith had made it very clear to her that she was to keep out of his "business." He gave her a driver's license made out to "Barbara J. Snyder" for the purpose of proving her age when they went to bars or nightclubs together. He often opened her purse, and told her she need not use the zippered compartment. Before they went out on the evening of February 1 he turned his back on her and put something in that compartment, which was later found to contain the additional fictitious checks and driver's licenses. When they reached the Sears parking lot Smith said he planned to buy a dress for her and told her to carry the .25-caliber automatic in her purse for him. She obeyed, as she had in the past, and they entered the store. She did not know he was still armed; during the shooting and the confu-

sion following it, she made no move to escape; and thereafter she fully cooperated with the police in their efforts to identify and apprehend "Jim Snyder."

Smith took the stand and corroborated Mrs. Walker's testimony as to her ignorance of his "business."[4] As for himself, he made in effect a judicial confession of all the crimes charged against him. He admitted conceiving the idea of the check forging operation, and described his participation therein during December 1963 and January 1964. As to the events of February 1, he admitted stopping on the way to Sears with Mrs. Walker at a number of liquor stores and food markets for the express purpose of cashing fictitious checks. He admitted presenting such a check at the cashier's department of Sears; and although he testified that he "didn't intend to kill anyone," his own description of the ensuing events discloses an unmistakable intent to shoot his way out of his predicament regardless of the cost in human lives.[5]

We shall consider the contentions of each appellant generally in the order presented.

---

[4]He testified, for example, that "I didn't think she was intelligent enough to put up the front, you might say, that was necessary to pass checks; and her memory was so bad that she couldn't remember hardly even the names that I was using, much less the one that she should be using."

[5]Thus Smith testified that after separating him from Mrs. Walker, Mr. Winters began to frisk him "and I just pulled the gun out and jerked loose from his arm and told him, 'Don't move.' And he backed up into a position right along here, and I was standing up here. (Indicating) So I started to go out this door, and I looked; and somewhere right along here, there was an officer with a gun. (Indicating) There was some more people out here on the floor, but I couldn't tell exactly who was who at the time. So I shot from out here. (Indicating) And I came back in this way. And as I turned around, Mr. Endler was pushing the left side of his coat back as if he were going for his gun, and I hollered, 'Don't move,' and I shot again, and I continued on past here and came out this door. (Indicating) I don't even recall this table being in front of the door; but I do remember coming past here, and I looked back down through this window, and an officer who has now been identified as Mr. Jurman was back down in this position still with the gun in his hand. (Indicating.) So I shot again through here (indicating) and I came down this way and down here. (Indicating) Now, I am not really certain in my own mind even whether Mr. Monaghan shot at me from over here or I shot first, I don't really know; but I don't remember running into this gate at all. But I do know that when I came out that gate, that I had to continue this way to get back out the same direction that I had came in (indicating)."

While testifying that he could not remember firing the shot that wounded Mr. Suzuki, Smith admitted that in making good his escape "I continued on running down this hall (indicating), hollering, 'Don't move! Don't move!' every time I would see someone."

*Challenges to prospective jurors.* Smith first contends that the trial court erred in sustaining the People's challenges for cause to a group of prospective jurors who stated that although they could vote for a verdict of guilty of first-degree murder, their moral scruples would prevent them from thereafter voting to fix the penalty at death. Penal Code section 1074, subdivision 8, provides that a challenge for implied bias may be taken "If the offense charged be punishable with death, the entertaining of such conscientious opinions as would *preclude his finding the defendant guilty*; in which case he must neither be permitted nor compelled to serve as a juror." (Italics added.) Smith argues that the scruples of the prospective jurors here involved would not have precluded such a finding of guilt but would only have precluded a vote to impose the death penalty. The same argument was considered at length and rejected in *People v. Riser* (1956) 47 Cal.2d 566, 573-576 [305 P.2d 1]. Smith urges that the result should be otherwise today because of the enactment since *Riser* of Penal Code section 190.1, providing for separate guilt and penalty trials and allowing a new jury to be empaneled for the latter phase "for good cause shown."

The point is without merit. The enactment of section 190.1 can in no way be construed as evidence of legislative intent to overrule our decision in *Riser,* which has since been cited in two further decisions of this court rejecting the argument here advanced by Smith. (*People v. Shipp* (1963) 59 Cal.2d 845, 853 [31 Cal.Rptr. 457, 382 P.2d 577]; *People v. Love* (1961) 56 Cal.2d 720, 726 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33].) On the contrary, a full quotation of the relevant sentence of section 190.1[6] discloses a directive of the Legislature that whenever possible the same jury shall serve at both phases of the trial for reasons of continuity and economy of effort. This directive of the Legislature neither denies the defendant due process of law nor favors the prosecution over the defense. (*People v. Gilbert* (1965) *ante,* pp. 690, 712 [47 Cal.Rptr. 909, 408 P.2d 365].)

*Smith's prior felony convictions.* The indictment charged Smith with six prior convictions of felony in various states and federal courts. Smith denied these allegations, and at the

---

[6] "If the defendant was convicted by a jury, the trier of fact *shall be the same jury* unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty." (Italics added.)

close of the People's case in chief on the guilt phase the prosecuting attorney introduced into evidence, without objection by Smith, documentary proof of the prior convictions charged. Smith then took the witness stand in his own defense. In the course of cross-examination the prosecuting attorney asked Smith if he had been convicted of each of the charged felonies and had served a term of imprisonment therefor, identifying each by the date and place of conviction and the name of the crime. Smith contends that such questions exceeded the allowable scope of cross-examination for impeachment purposes.

The contention is without merit. ■ A defendant who testifies in his own behalf may be impeached by proof he has suffered one or more prior convictions of felony in this state or elsewhere. (Code Civ. Proc., §§ 2051, 2065.) ■ While the courts will be zealous to insure that the prosecuting attorney is not permitted to delve into the details and circumstances of the prior crime (*People* v. *David* (1939) 12 Cal.2d 639, 646 [86 P.2d 811]; *People* v. *Wynn* (1941) 44 Cal.App.2d 723, 731-733 [112 P.2d 979]), simple questions designed to identify the particular felony involved in the conviction are allowable. Thus the name or nature of the crime may be asked (*People* v. *David* (1939) *supra,* 12 Cal.2d 639, 646; *People* v. *Miller* (1961) 196 Cal.App.2d 171, 176 [16 Cal.Rptr. 408]), and an inquiry into the place and date of the conviction is harmless as such details will appear in any event on the face of the record of judgment (*People* v. *Tubby* (1949) 34 Cal.2d 72, 79 [207 P.2d 51]; cf. *People* v. *Muchupoff* (1926) 79 Cal.App. 306, 310-312 [249 P. 240]).

Smith contends that the prosecuting attorney in the present case was allowed to go beyond these limits and ask him the actual terms of imprisonment he served on each prior conviction. Inquiry into ''the length of time served and conditions or circumstances surrounding the parole of a defendant'' is improper (*People* v. *Wynn* (1941) *supra,* 44 Cal.App.2d 723, 732; accord, *People* v. *Hollander* (1961) 194 Cal.App.2d 386, 396 [14 Cal.Rptr. 917]), but here no such questions were asked. ■ The prosecuting attorney did not inquire how long defendant spent in prison under the prior convictions, but simply asked in each case ''Did you serve a term of imprisonment in the State [or federal] prison for that?'' Only once was the actual term mentioned, and then it was volunteered by Smith. As to certain of the prior crimes the inquiry

was proper for the purpose of establishing whether, upon conviction, Smith should be adjudged an habitual criminal. (Pen. Code, § 644.) While the prosecutor in some instances asked the same question as to other priors that are not listed in the statutory definition of habitual criminality, we note that the rule excluding such a question is not as rigid as Smith implies. The matter turns in large part on the good faith of the prosecutor (see *People* v. *Linyard* (1957) 151 Cal.App.2d 50, 54-55 [311 P.2d 57]) ; and where, as here, the questions are brief and to the point, and there is no indication of a deliberate attempt by the prosecutor to prejudice the defendant in the eyes of the jury, it is within the trial court's discretion to allow the inquiry. No abuse of that discretion is shown here.

Smith also complains that the court failed to give appropriate limiting instructions upon request at the time the foregoing questions were asked. The court replied that it would give such instructions ''when the proper time comes,'' and proceeded to do so in its charge to the jury at the close of the guilt phase. In particular, the court on defendant's request carefully instructed as to the limited purposes for which the evidence of Smith's prior convictions could be considered by the jury, and warned the jury that ''You must not use this evidence in determining the defendant's guilt or innocence of the other charges, nor must you permit yourself to be influenced against the defendant because he may have suffered a prior felony conviction.'' Such instructions adequately protected Smith's substantive rights.

*Proof and instructions relating to conspiracy.* The prosecution advanced two theories to warrant a verdict of first-degree murder against Smith : that the killings of Officers Monaghan and Endler were deliberate and premeditated, or that they occurred in the perpetration of burglary, i.e., during Smith's entry into Sears with the intent to commit the felony of forgery. (Pen. Code, §§ 189, 459, 470.) There was ample evidence to support a first-degree murder conviction of Smith on either or both of these grounds, and the court gave corresponding proper instructions.

There was also ample evidence that Smith and Castner, and possibly Anderson in addition, were guilty of forgery and conspiracy to commit forgery. Yet rather than ask for an indictment on these simple and provable charges, the prosecution apparently sought to use the fact of the common forgery

operation as a means to ensure first-degree murder convictions of everyone in any way connected with these events. For this purpose, of course, a charge of conspiracy merely to commit forgery would have been insufficient because it would not have involved the felony-murder doctrine. To bring that doctrine into play, the prosecution charged instead that Smith, Castner, Anderson, and Mrs. Walker had committed a compound crime entitled ''conspiracy to commit forgery and burglary.'' The evidence is thin indeed that such a conspiracy ever existed here. Rather, the jury's verdict on Count I may well have been based on the not unnatural surmise that if several persons conspire to prepare fictitious checks, they probably also intend to pass them for profit in stores or other business establishments. It is true that Smith himself clearly intended to pass these checks in stores, and he admitted as much on the witness stand. But other than mere association and opportunity to conspire, there is little evidence from which the jury could justifiably have believed beyond a reasonable doubt that Castner, Anderson, or Mrs. Walker participated in the burglarious plans of Smith.

At this time, however, we need not finally determine whether the evidence of conspiracy to commit burglary is so inadequate as to require reversal on that ground alone. Anderson is not a party to this appeal; and as will appear, the judgments as to Castner and Mrs. Walker must be reversed in any event because of the admission into evidence of statements obtained in violation of the rules of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. For the purpose of discussing Smith's contentions on the subject of conspiracy, we will assume arguendo that the evidence is sufficient in this regard.[7]

 Smith complains that the court erred in sustaining an objection to the following question asked of him by his counsel: ''Mr. Smith, when you entered any establishment that you did enter for the purpose of cashing one of these checks, did you

---

[7] If the evidence on Count I is legally insufficient, of course, it is insufficient as to all three defendants convicted on that count, including Smith. But such a determination could not benefit the latter, who remains under two valid sentences of death. The conspiracy theory of Count I added nothing to the prosecution's proof that Smith, the actual killer of Officers Monaghan and Endler, was guilty of first-degree murder on Counts II and III. In particular, even if the jury found that Smith entered the Sears store in furtherance of the alleged conspiracy to commit burglary, that same entry was an act of burglary sufficient to call into play the felony-murder rule.

have any knowledge that when you entered that store or that establishment, that that would constitute a crime of burglary in California?" It is urged that this question was essential to Smith's defense because he proposed to testify he was ignorant of the law of burglary in California and therefore "had no intent" to commit that crime. To state the argument is to refute it. It is true, as we held in *People* v. *Marsh* (1962) 58 Cal.2d 732, 743-744 [26 Cal.Rptr. 300, 376 P.2d 300], that to sustain a conviction of conspiracy there must be proof that the accused entered into the criminal agreement with the specific intent to commit the substantive crime; but it is also the rule that the specific intent necessary to commit burglary is simply the felonious design with which the accused enters the building, i.e., "with intent to commit grand or petit larceny or any felony" therein. (Pen. Code, § 459; *People* v. *Sears* (1965) 62 Cal.2d 737, 745-746 [44 Cal.Rptr. 330, 401 P.2d 938]; see generally 25 So.Cal.L.Rev. 75, 88-91.) Here, proof of that intent on Smith's part was conclusively established by his judicial confession that he entered the stores in question for the sole purpose of cashing checks he knew had been forged. He admitted knowing it was unlawful to pass such forged checks; and whether or not he also knew which precise statute or code section he was violating when he entered the stores with this intent is, as the trial court ruled, irrelevant.

In short, the law recognizes honest purpose, not dishonest ignorance of the law, as a defense to a charge of committing a crime requiring "specific intent." As we said in *Marsh* (at p. 743 of 58 Cal.2d, quoting from *People* v. *Bucchierre* (1943) 57 Cal.App.2d 153, 163 [134 P.2d 505]), "The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?" This is a far different question from the one here asked of Smith, and had it been asked, he admittedly could not have answered it in the affirmative.

Smith contends that any conspiracy to commit forgery or burglary terminated as a matter of law when he and Mrs. Walker were "placed into custody by police officers." Once again the facts do not support his contention. At the time of the shooting neither Smith nor Mrs. Walker had been placed under arrest; and although the store personnel had expressed doubts about the validity of the check and license presented by Smith, the matter was still under investigation

when Smith suddenly drew his gun and began firing. It has long been settled, of course, that "whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury [citations], and if there be any evidence to support the finding of the jury on this question, its determination is conclusive." (*People* v. *Kauffman* (1907) 152 Cal. 331, 335 [92 P. 861].)

Directly in point are *Kauffman* and a number of later decisions (e.g., *People* v. *Boss* (1930) 210 Cal. 245 [290 P. 881]; *People* v. *Wells* (1960) 187 Cal.App.2d 324 [9 Cal.Rptr. 384]; *People* v. *Corkery* (1933) 134 Cal.App. 294 [25 P.2d 257]; see also *People* v. *Ketchel* (1963) 59 Cal.2d 503, 523-524 [30 Cal.Rptr. 538, 381 P.2d 394]), which hold that each conspirator is bound by the acts of a confederate in furthering the common design of the conspiracy by escaping or resisting arrest, even though such acts may have been "dictated by the exigencies of the moment." Smith contends that these decisions are no longer good law because of *Grunewald* v. *United States* (1957) 353 U.S. 391 [77 S.Ct. 963, 1 L.Ed.2d 931, 62 A.L.R.2d 1344]. That case, however, is not in point, for it and its predecessors (*Krulewitch* v. *United States* (1949) 336 U.S. 440 [69 S.Ct. 716, 93 L.Ed. 790], and *Lutwak* v. *United States* (1953) 344 U.S. 604 [73 S.Ct. 481, 97 L.Ed 593]) held only that "after the central criminal purposes of a conspiracy have been attained, a subsidiary *conspiracy to conceal* may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." (Italics added.) (353 U.S. at pp. 401-402.)

Here, the events had not progressed as far as in *Grunewald*, for Smith was not attempting to conceal a successfully completed crime but to escape arrest for an unfinished crime that was on the brink of being uncovered in his presence. His acts were clearly part of the res gestae of the offense, and *Grunewald* in no way affects the settled rules of liability for such conduct.

Smith contends that the instructions on conspiracy and various other theories of the case were contradictory and confusing. It would unduly prolong this opinion to discuss the particulars of Smith's contention; we have examined the instructions and conclude that taken together, as the jury was

charged to do, they fairly state the law governing this somewhat complicated multiple trial.

*Procedure at the penalty phase.* Smith contends that in this phase the People should not be permitted to open and close either the presentation of evidence or the arguments to the jury. This point has more than once been rejected by this court. (*People* v. *Love* (1961) *supra,* 56 Cal.2d 720, 725; *People* v. *Corwin* (1959) 52 Cal.2d 404, 407 [340 P.2d 626].) Equally without merit are Smith's contentions that the penalty phase instruction we proposed in *People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33], is improper (*People* v. *Jacobson* (1965) *ante,* pp. 319, 332 [46 Cal.Rptr. 515, 405 P.2d 555]), and that the court should have instructed the jurors that if they had a reasonable doubt as to which penalty was proper they should resolve that doubt in favor of life imprisonment (*People* v. *Howk* (1961) 56 Cal.2d 687, 697-699 [16 Cal.Rptr. 370, 365 P.2d 426]).

 *Questions of search and seizure.* Shortly after the commission of the crimes on the evening of February 1 police officers entered the house at the rear of 2962 Veteran Avenue, Los Angeles, where Smith and Mrs. Walker lived together, and removed therefrom certain items of evidence. Defendants objected to the introduction of these items on the ground of illegal search and seizure, and the matter was heard at length in the absence of the jury. At the outset the prosecution stipulated that the entry and search were made without a warrant, thereby assuming the burden of showing proper justification. (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113].)

Officer Sinclair testified that he arrived at Sears within minutes after the shooting and took charge of Mrs. Walker. He explained, ''We were seeking the identity of the man who had accompanied her into Sears.'' In Mrs. Walker's purse he found her driver's license bearing the address, 2962 Veteran Avenue. He asked her if the latter was her address, and she said it was. He asked her who lived with her at that address, and she said that Lee did, the man who had come into the store with her (i.e., defendant Leaman Smith). The officer then asked her if Lee would go back to that address, and she answered, ''I suppose he will. His clothes are there.'' Officer Sinclair then asked her, ''You don't mind if we go and wait for him?'' and Mrs. Walker replied, ''No. I hope you catch him.'' Officer Sinclair instructed two uniformed policemen

to stake out the Veteran Avenue premises and stop anyone who tried to enter or leave.

Officer Sinclair then conducted Mrs. Walker next door to the Wilshire station where he questioned her further, his purpose being "To attempt to identify the man that shot the officers." She said she didn't know his real name, but that he had told her to call him "Jim Snyder." She gave a physical description of Smith, and Officer Sinclair caused this description to be broadcast over police radio, then sent Officer Denver, a plainclothesman, to the Veteran Avenue address. Officer Denver was instructed to "take up a position" at that address "to apprehend the suspect wanted, if he should arrive there; and also to obtain whatever information I could which would assist to identify the suspect or to determine his present whereabouts." When Denver arrived, Officers Germann and Ruedy had already entered the house.

At the Wilshire station Officer Sinclair asked Mrs. Walker if she had any pictures of "this Jim Snyder." She said there were pictures of him at the Veteran Avenue house, and he asked her if it would be all right for the police to pick them up. She said she didn't mind if they did so, and repeated, "I hope you catch him." Officer Sinclair then asked her if there was anything else in the house to identify "Jim Snyder," and she answered that there might be "something in a bag or some bags."

Officer Sinclair then spoke by telephone to Officer Denver at the Veteran Avenue house and instructed him to pick up the pictures of "Jim Snyder" and "anything else that might aid in identifying him." Being aware, moreover, that the entire shooting incident had arisen out of an attempt by "Jim Snyder" to pass an Alka-Seltzer check of doubtful validity, Officer Sinclair spoke to Officer Denver a second time and told him generally to bring in all identifying evidence in "a forgery case or shooting case." In the ensuing search the officers found and removed a photograph of Smith and Mrs. Walker, a box of .38-caliber ammunition, a box of .25-caliber ammunition, a toy pistol, a packet of Colgate-Palmolive checks, a packet of Alka-Seltzer checks, a checkwriter, a typewriter, five partially-completed California driver's licenses, and several receipts. After hearing the foregoing testimony the court held the search to be lawful and overruled defendants' objections to the evidence seized. This ruling was correct.[8]

---

[8]Although the attack on the ruling is made in Mrs. Walker's brief, we discuss its merits because it is also relevant to Smith's appeal.

It will be remembered that the shootings took place in front of numerous eyewitnesses, some of them police officers. Although "Jim Snyder" escaped from the scene, the manhunt began immediately. It was reasonable for the police to believe he might stop at his house before continuing his flight, to obtain clothes, money, or ammunition. This belief, in fact, was shared by his mistress, who communicated it to the police at that time.　　To make an arrest, a peace officer may break open the door or window of the house in which he has reasonable grounds for believing the suspect to be, "after having demanded admittance and explained the purpose for which admittance is desired." (Pen. Code, § 844.) But compliance with the latter section "is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose." (*People* v. *Maddox* (1956) 46 Cal.2d 301, 306 [294 P.2d 6].)

It was with this kind of danger in mind that Officer Germann took reasonable precautions in entering the house on Veteran Avenue. He had received a radio message instructing him to stake out that house, and informing him that the suspect had just killed two policemen at the Sears store. Failing to obtain a key from the adjacent house of the landlord, Officer Germann approached the suspect's residence while "covered" by his fellow officers. He shone a flashlight into various rooms, saw no one, tried the doors and found them locked, then slipped in through an unlocked window and crawled to the door which he opened for his partner, Officer Ruedy. With drawn guns the policemen then searched the house for the suspect or "for any evidence of the suspect's having been there and gone."　　The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute "exceptional circumstances" sufficient to justify a search without a warrant. (*Johnson* v. *United States* (1948) 333 U.S. 10, 14-15 [68 S.Ct. 367, 92 L.Ed. 436]; *McDonald* v. *United States* (1948) 335 U.S. 451, 454-455 [69 S.Ct. 191, 93 L.Ed. 153]; *id.* at pp. 459-460 [concurring opinion of Jackson, J.]; *Brinegar* v. *United States* (1949) 338 U.S. 160, 183 [69 S.Ct. 1302, 93 L.Ed. 1879] [dissenting opinion of Jackson, J., quoted with approval in *People* v. *Schader* (1965) 62 Cal.2d 716, 724 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Gilbert* (1965) *ante*, pp. 690, 706-707 [47 Cal.Rptr. 909, 408 P.2d 365].)

Nor were the police required at that point to abandon their search for "Jim Snyder" or his true identity. They were not compelled to close their eyes to the contents of the house, and their ensuing search was incidental to the purpose of their entry. While in the house, it was not unreasonable for the officers to look about them for evidence that would identify the suspect, thus far known to them only by one of his several aliases, or that would enable them to pick up his trail. The evidence obtained by that search was properly admitted.

The second ground of the trial court's ruling was that Mrs. Walker had given valid consent to the entry and search. (*People* v. *Burke* (1956) 47 Cal.2d 45, 49 [301 P.2d 241]; *People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852].) Mrs. Walker now argues that her consent was limited to an entry for the single purpose of retrieving the pictures of Smith, but the record shows a much broader permission given by her to Officer Sinclair. That officer testified, for example, "I asked her this many times, if she minded if we went to the 2962 Veteran Avenue address *to try to find something to identify Jim Snyder,* and she always replied that she didn't mind; she hoped we caught him." (Italics added.)

Mrs. Walker also contends that her consent was involuntary and was given only "because of assertion of authority by police officers." While permission obtained by means of such an assertion of authority is constitutionally inadequate (*People* v. *Shelton* (1964) 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665], and cases cited), there is no showing of a compulsion of this type in the present case. It is true that Mrs. Walker was under arrest at the time; but that fact, although relevant (*People* v. *Shelton, supra,* at p. 745), is "not conclusive" (*Castenada* v. *Superior Court* (1963) 59 Cal. 2d 439, 443 [30 Cal.Rptr. 1, 380 P.2d 641]). "It cannot be said as a matter of law that consent given by a defendant is involuntary because it is given while he is under arrest." (*People* v. *Fischer* (1957) 49 Cal.2d 442, 448 [317 P.2d 967].) Rather, the question is one of fact "to be determined in the light of all the circumstances." (*People* v. *Michael* (1955) *supra,* 45 Cal.2d 751, 753; accord, *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 762-763 [44 Cal. Rptr. 313, 401 P.2d 921].) Here, the record shows no reluctance on Mrs. Walker's part to cooperate with the police; as noted above, on several occasions she even expressed the hope that Smith would be apprehended. Furthermore, in her

testimony at the trial she reiterated her consent and did not claim that it had been other than voluntary. Taken as a whole, the record supports the trial court's conclusion that "I am satisfied that Barbara Walker gave consent to the entry to assist in identifying and capturing Smith."

Apparently on Smith's behalf, Mrs. Walker argues that her consent was not binding on Smith, cooccupant with her of the premises at 2962 Veteran Avenue. She relies on such cases as *People* v. *Shelton* (1964) *supra,* 60 Cal.2d 740, 745, and *Tompkins* v. *Superior Court* (1963) *supra,* 59 Cal.2d 65, 68-69; but those and similar decisions are distinguishable in that they dealt with situations in which one joint occupant, away from the premises, purported to authorize police officers to enter and search the premises over the express objection of another joint occupant who was actually on the premises at the time. Here, by contrast, Mrs. Walker's cooccupant was not only absent; he was in full flight and had virtually abandoned the premises. In these circumstances there is no impediment to invoking the rule that a search is not unreasonable if made with the consent of a cooccupant of the premises who, by virtue of his relationship or other factors, the officers reasonably and in good faith believe has authority to consent to their entry. (*People* v. *Gorg* (1955) 45 Cal.2d 776, 783 [291 P.2d 469]; accord, *People* v. *Guyette* (1964) 231 Cal. App.2d 460-465 [41 Cal.Rptr. 875]; *People* v. *Kinard* (1962) 210 Cal.App.2d 85, 87 [26 Cal.Rptr. 377]; *People* v. *Ortiz* (1962) 210 Cal.App.2d 489, 498 [26 Cal.Rptr. 677]; *People* v. *Rogers* (1962) 207 Cal.App.2d 261, 266 [24 Cal.Rptr. 341]; and cases cited in *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 608, fn. 1 [21 Cal.Rptr. 552, 371 P.2d 288].)

This is not a case in which, as in *Stoner* v. *California* (1964) 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 856], consent was purportedly given by one who was not a cooccupant but who had merely a limited right of entry for certain specific purposes (i.e., a hotel clerk). Here, Mrs. Walker was Smith's mistress, and at the time of the crimes was living with him in the Veteran Avenue house. We have held that a valid consent may be given by a defendant's wife (*People* v. *Ingle* (1960) 53 Cal.2d 407, 416 [2 Cal.Rptr. 14, 348 P.2d 577]), and numerous cases have taken the logical step of including within this rule consent given by a defendant's mistress (e.g., *People* v. *Nelson* (1963) 218 Cal.App.2d 359, 362-363 [32 Cal.Rptr. 675]; *People* v. *Smith* (1960) 183 Cal.App.2d

670, 671 [6 Cal.Rptr. 866]; *People* v. *Howard* (1958) 166 Cal.App.2d 638, 651 [334 P.2d 105]; cf. *People* v. *Triche* (1957) 148 Cal.App.2d 198, 203-204 [306 P.2d 616]).

Finally, Mrs. Walker complains that various items taken by the police from the automobile that Smith drove on the evening of February 1, and introduced into evidence over objection, were obtained by an illegal search and seizure. The car was found parked on a side street on February 3, and an inventory of its contents was taken later that day at the Wilshire police station; it was stipulated that the inventory was made without a search warrant. Mrs. Walker seeks to bring this case within the authority of *Preston* v. *United States* (1964) 376 U.S. 364, 366-367 [84 S.Ct. 881, 11 L.Ed.2d 777], and *People* v. *Burke* (1964) 61 Cal.2d 575, 578-580 [39 Cal.Rptr. 531, 394 P.2d 67], but both decisions are distinguishable on the same ground. In each, the defendants were arrested in or near their automobile because of their suspicious conduct in the immediate vicinity; although a search of the car at that place and time would have been permissible as an incident to the arrest, the police did not do so; instead, the defendants were taken to the police station and their car was conveyed to a garage and impounded, where at a subsequent time it was searched and its contents seized. On these facts both this court (in *Burke*) and the United States Supreme Court (in *Preston*) held that the delayed search of the car could not be justified as incidental to the arrest because it was "too remote" in time and place.

In the present case, however, the People do not attempt to justify this search as incidental to an arrest, i.e., the ground relied on in *Burke* and *Preston*. In distinction to those cases, here the car was abandoned property when it was found by the police. ■■■ Smith had rented it from Avis Rent-A-Car some two weeks prior to February 1, under a fictitious name, and had equipped it with stolen license plates. Smith himself testified that after using the car to escape from the Sears parking lot he abandoned it on a side street, parking it between two other cars to prevent a quick check on its license plates. As we know, he then hailed a taxi, met Castner and Phillips in a bar, and left the city by freight train, finally being arrested in Chicago four days later. It may reasonably be inferred from such conduct that Smith had abandoned any interest he possessed in either the car or its contents, the latter being mainly liquor and groceries purchased by Smith on the way to Sears to facilitate cashing his fictitious checks.

In these circumstances the controlling decision is *Abel* v. *United States* (1960) 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668]. There, the defendant was arrested in his hotel room; he was allowed to pack and take whatever he desired with him; then he vacated the room, paid his bill, and left in custody of the arresting officers. After his departure F.B.I. agents searched the room he had vacated, with permission of the management but without a search warrant, and found in the wastebasket incriminating evidence that was subsequently used against him at his trial. The United States Supreme Court upheld the legality of this search on the ground that "at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerend, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property. See *Hester* v. *United States*, 265 U.S. 57, 58 [44 S.Ct. 445, 68 L.Ed.2d 898]." (*Id.* at p. 241.)

The analogy between the vacating of a rented hotel room and the abandonment of a rented automobile is persuasive. Here, as in *Abel*, the property in question was *bona vacantia* as far as Smith was concerned. The police therefore were free to seize and search the vehicle without fear of infringing any of Smith's constitutional rights. (For a case applying this rule to the search of an abandoned "getaway" car, see *People* v. *Harper* (1962) 26 Ill.2d 85 [185 N.E.2d 865, 868].)

 *Extrajudicial statements of Mrs. Walker and Castner.* During the night of February 1-2 Mrs. Walker and Castner were separately interrogated at the Wilshire police station. Although the interrogation of Mrs. Walker was directed in part to discovering the identity of a third suspect still at large, the investigation had nevertheless focused on Castner and her as probable participants in the crimes. Each was under arrest and in custody at that time, and the police had undertaken a process of interrogations that lent itself to eliciting incriminating statements. The inquiry had thus reached the accusatory stage as to Mrs. Walker and Castner (cf. *People* v. *Mathis* (1965) *ante*, pp. 416, 431-432 [46 Cal.

Rptr. 785, 406 P.2d 65]), and they were constitutionally entitled to be informed of their right to counsel and their right to remain silent. (*Escobedo* v. *Illinois* (1964) *supra,* 378 U.S. 478; *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338.)

The record does not show that Mrs. Walker was informed of her rights in this regard, and under *People* v. *Stewart* (1965) 62 Cal.2d 571, 580-581 [43 Cal.Rptr. 201, 400 P.2d 97], we will not presume in the face of a silent record that the necessary warning was given. As to Castner, the Attorney General makes much of the fact that this defendant had some acquaintance with law books and some awareness of his privilege against self-incrimination, yet he confessed nevertheless. But we are dealing here not merely with an informed citizen's knowledge of the existence of a privilege against self-incrimination, but with a criminal suspect's right to effective, practical aid of counsel at a crucial point in the prosecution against him. The officer who conducted the interrogation of Castner admitted on the witness stand that as many as four times during the questioning, including once at the outset, Castner specifically asked to be allowed to consult with an attorney; the officer testified that Castner was not allowed to do so, and was told that he could seek legal advice "as soon as we are through talking to him." In such circumstances no waiver of the constitutional right to counsel will be presumed. (*People* v. *Mathis* (1965) *supra, ante,* pp. 416, 432; *People* v. *Modesto* (1965) 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753].)

It follows that the admission into evidence of the statements of Mrs. Walker and Castner constituted error under *Escobedo* v. *Illinois, supra,* and *People* v. *Dorado, supra.* The final question to be determined is whether such errors were prejudicial. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].) It is true, as the Attorney General emphasizes, that Mrs. Walker's statements do not amount to outright confessions, and that she steadfastly denied any knowledge of or participation in a conspiracy to commit forgery or burglary or both. But her statements were not wholly exculpatory, as were those involved in *People* v. *Mathis* (1965) *supra, ante,* pp. 416, 432-433, and *People* v. *Hillery* (1965) 62 Cal.2d 692, 712-713 [44 Cal.Rptr. 30, 401 P.2d 382]. In the present case, by contrast, the interrogation of February 1 began with

the admission by Mrs. Walker, relating to her presence in Sears with Smith on the night of the crimes, that she "came in there with him to cash a check." She went on to admit she knew he was using false names, had no regular job, forged her California driver's license, and carried a gun whenever he went out. She also admitted having seen Smith and Castner working over blank checks in their house, using a silk screen. The Attorney General seeks to minimize the effect of these and similar admissions by Mrs. Walker, pointing out that she thereafter took the witness stand and repeated in her testimony the gist of her extrajudicial statements. But when Mrs. Walker testified, the only substantial evidence that had been introduced connecting her with the conspiracy was the reading of her statement of February 1 to the jury and the playing of the tape-recording of that same statement. Her testimony was therefore "impelled by the erroneous admission of that evidence and cannot be segregated therefrom to sustain the judgment." (*People* v. *Davis* (1965) 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142]; accord *People* v. *Clark* (1965) 62 Cal.2d 870, 881-882 [44 Cal.Rptr. 784, 402 P.2d 856].) Moreover, the prosecution thought enough of her statements to use one in rebuttal and to refer to the contents of others a number of times in closing argument to the jury, as evidence of her asserted consciousness of guilt and knowledge of the conspiracy.

Castner's statement constituted a full confession of the crime of check forgery, and strong evidence of his participation in a conspiracy to commit such forgery. He admitted that he had placed the account numbers on the checks by means of a silk-screen process, explaining how suspicion was allayed by using only nonunion printing shops to print the blanks; he admitted that he had provided all the equipment and materials to print the account numbers; he acknowledged that he had no authority from either Colgate-Palmolive or Alka-Seltzer to print its checks, and that when he did so he knew someone was "going to be hurt" and a "lot of money" lost. The Attorney General concedes that Castner's statement was "generally incriminating," as indeed it was. Moreover, since Castner chose not to take the witness stand this statement constituted the primary prosecution evidence, apart from the testimony of accomplices, connecting him with the crimes charged.

In view of the meager amount of properly admitted evidence

of participation by either Mrs. Walker or Castner in a conspiracy to commit burglary, the use of their extrajudicial statements obtained in violation of *Escobedo* and *Dorado* must be held prejudicial error.[9] That error, however, did not taint Smith's judgment of conviction. The jury was carefully instructed that each extrajudicial statement was limited to the defendant making it, and that statements of a defendant-accomplice must be corroborated and should be viewed with distrust. More importantly, the independent evidence of Smith's guilt was overwhelming: not only was he positively identified by numerous eyewitnesses, but he took the stand himself and in effect made a detailed judicial confession of all the crimes charged. In the premises there is no reasonable possibility that the error in admitting the statements of Mrs. Walker and Castner might have contributed to Smith's conviction. (Cal. Const., art. VI, § 4½; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Gilbert* (1965) *ante,* pp. 690, 702 [47 Cal.Rptr. 909, 408 P.2d 365].)

The judgment as to Smith is affirmed. The judgments as to Castner and Mrs. Walker are reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.

The petition of appellant Smith for a rehearing was denied February 2, 1966.

---

[9]Because of this disposition we need not reach a contention raised by Mrs. Walker concerning the adequacy of the court's answer to a question of law asked by the jury during its deliberations.