[Crim. No. 17994. First Dist., Div. One. May 16, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD JAMES NEWELL et al., Defendants and Appellants.

[Crim. No. 18009. First Dist., Div. One. May 16, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE ANTHONY HADZIMA, JR., Defendant and Appellant.

32

---

---

**COUNSEL**

Patrick H. Hetrick, under appointments by the Court of Appeal, for Defendants and Appellants in No. 17994.

Richard G. Sherman for Defendant and Appellant in No. 18009.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.**—Defendants George Anthony Hadzima, Jr., Donald James Newell, and William Edward Donohue pleaded guilty to several counts of burglary following the superior court's denial of their Penal Code section 1538.5 motion to suppress evidence essential to their successful prosecution, and which led to their arrests and guilty pleas. Hadzima appeals from a judgment under which he was sentenced to state prison. Newell and Donohue, jointly represented by other counsel, appeal from orders granting probation conditioned upon six months of county jail confinement. We have consolidated the appeals for hearing and determination.

Our conclusion, for the reasons which now follow, is that the superior court did not err in denying the motion to suppress, and that the respective judgment and orders granting probation must be affirmed.

The relevant evidence is uncontroverted.

Defendant Hadzima was the proprietor of "Touch of Class," a clothing store in Thousand Oaks, Ventura County, California. In the early part of June 1977, he separately approached the proprietors of similar stores called "James Fine Men's Apparel," "Famous Fashions," and "Madd Hatter" of a Contra Costa County shopping center. He introduced himself under the fictitious name of Jim Toland, and expressed an interest in establishing a children's store in vacant premises available for leasing and situated between James Fine Men's Apparel and Madd Hatter. He was permitted to look through the several stores and, among other things, he inquired about the quality of the police security service. Soon thereafter, June 9, 1977, Hadzima leased the vacant store under the name of James Toland through a real estate broker. He paid a small deposit, $200, and was to take immediate possession of the premises after obtaining a key from the manager of James Fine Men's Apparel. Hadzima did not obtain the key.

Around 3 o'clock of the morning of Sunday, June 19, 1977, Hadzima, accompanied by defendants Newell and Donohue, drove a rented truck to the rear door of the vacant store. After backing the truck up to the door the men entered the premises. With tape and nails they fastened cloth and butcher paper across the premises so as to prevent observation of their activities from the outside. They then, with heavy tools, cut and sawed through the vacant store's partitions on either side, thus opening door-sized and -shaped holes into Famous Fashions and Madd Hatter. They then cut a smaller hole in the wall between Madd Hatter and James Fine Men's Apparel. Merchandise valued at upwards of $75,000 was removed from the three stores.

The next morning Hadzima drove the rented truck to the back door of Touch of Class in Thousand Oaks. He explained to his employees "that a friend of his and his wife were divorcing and that they were closing out a store and he had bought all of the merchandise from this couple." And he then instructed them to replace the tags on the clothing with Touch of Class tags.

During the afternoon of the day of Hadzima's criminal adventure the proprietress of Madd Hatter entered her closed store and observed the holes in its walls and its empty clothing racks. She called the police and an officer promptly arrived. He checked out the four then interconnected store areas for persons who might be hiding and found none. He then radioed the station "to try to find the owners of the men's store, the Famous Fashion, and also called for detectives . . . ."

A detective soon arrived and entered Madd Hatter, and Famous Fashions. He proceeded to the hole leading to the vacant store. Looking into those premises he could see much nearby debris, consisting of wallboard, plaster, and wood fragments as well as the material screening observation from the vacant store's frontage. Also, in plain view from Madd Hatter, he observed "three [paper] bags, empty rolls of duck [duct?] tape [and] nails" and nail cartons. In all other respects the vacant store was "empty."

The detective entered the vacant premises and proceeded to collect such items as appeared to him to have probable evidentiary or investigative value. Among the things he picked up were the three paper bags. He later testified: "I looked in them. I didn't see anything. Or, I didn't feel any weight. They appeared to be empty." He "felt that the perpetrators had either brought some tools [and tape and nails] in or had brought the

bags into the vacant store." He thought the bags should "be processed for latent fingerprints," and he picked them up for that "purpose." Throughout this time the victimized tenants of the adjoining stores, and others, were in and out of the vacant premises. The day was Father's Day and the store owners and interested people who had gathered "were irritated" and "most of them wanted to go home to their families. [They] requested we come back the next day to complete it." The detective obliged them. He secured the premises, including the vacant store's back door. He might have heard that the empty space "was in possession of somebody" when he entered it, "but . . . probably didn't think of it at that time." As requested by the nearby tenants the detective returned to complete the on-site investigation the next day, Monday.

The detective had delivered the three bags to a police fingerprint processor. No usable prints were observed by him, but inside one of the otherwise empty bags was found a "K-Mart" sales receipt which was marked "MC," indicating a "Master Charge" purchase. Further investigation disclosed that defendant Newell had made the purchase, and that he, Hadzima, and Donohue were the perpetrators of the burglaries. And thereafter it was learned that Hadzima, at least, had been engaged in a similar criminal enterprise in Stanislaus County.

Defendants contend that the police committed three successive Fourth Amendment violations. The first, they say, was the entry upon the vacant premises in violation of the security and privacy rights of the shopping center's lessor, the lessee Hadzima, and vicariously (see *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 161 [98 Cal.Rptr. 649, 491 P.2d 1]), the similar rights of Newell and Donohue. The second and third violations of such of their rights consisted of the seizure of the paper bags, and the subsequent "looking into them" while processing for fingerprints. There follows, they argue, a constitutional imperative that evidence of the bags and their fruits, the K-Mart sales slip and consequent discovery of their culpability, be suppressed.

We consider initially, defendants' claim of a "constitutional right" to have the incriminating fruits of the evidence seized by the detective suppressed. Such a *constitutional right* does not exist. The rule requiring suppression of evidence in a proper case "is a *judicially created remedy* designed to safeguard Fourth Amendment rights generally . . . . [¶] . . . [it] has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." (*United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613], fn.

omitted, italics added; and see *United States* v. *Acosta* (5th Cir. 1974) 501 F.2d 1330, 1336 [cert. den., 423 U.S. 891 (46 L.Ed.2d 122, 96 S.Ct. 188)].) Nor is there such an absolute statutory right. Penal Code section 1538.5 is directed only toward implementation of such Fourth Amendment rights of an accused as he may have. (*People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 128 [74 Cal.Rptr. 294, 449 P.2d 230]; and see *People* v. *Manning* (1973) 33 Cal.App.3d 586, 599 [109 Cal.Rptr. 531]; *Kirby* v. *Superior Court* (1970) 8 Cal.App.3d 591, 597 [87 Cal.Rptr. 577].)

■ "[T]he constitutionality of a particular search is a question of reasonableness and depends on '*a balance between the public interest, and the individual's right to personal security* free from arbitrary interference by law officers.' " (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 406 [57 L.Ed.2d 290, 309, 98 S.Ct. 2421, conc. and dis. opn., italics added]; *United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607, 614-615, 95 S.Ct. 2574].)

■ The protection of the Fourth Amendment against unreasonable searches and seizures extends, of course, to business premises. (*Go-Bart Co.* v. *United States* (1931) 282 U.S. 344 [75 L.Ed. 374, 51 S.Ct. 153].) But nevertheless "business premises may . . . reasonably be inspected in many more situations than private homes, . . ." (*See* v. *City of Seattle* (1967) 387 U.S. 541, 545-546 [18 L.Ed.2d 943, 948, 87 S.Ct. 1737].) Stricter requirements of reasonableness may apply where a dwelling is being searched. (See *Davis* v. *United States* (1946) 328 U.S. 582, 592-593 [90 L.Ed. 1453, 1459-1460, 66 S.Ct. 1256].) "[P]rivate dwellings [are] ordinarily afforded the most stringent Fourth Amendment protection." (*United States* v. *Martinez-Fuerte* (1976) 428 U.S. 543, 561 [49 L.Ed.2d 1116, 1130, 96 S.Ct. 3074].) "What may be unreasonable in a search of a man's house, may be entirely reasonable in a search of his place of business." (*Giacona* v. *United States* (1958) 257 F.2d 450, 456, fn. omitted [cert. den., 358 U.S. 873 (3 L.Ed.2d 104, 79 S.Ct. 113)].) And it logically follows that a search of vacant and empty business premises will be subject to an even lesser standard of reasonableness.

■ The Fourth Amendment proscribes only *unreasonable* searches and seizures. (See *Mincey* v. *Arizona, supra,* 437 U.S. 385, 389-390 [57 L.Ed.2d 290, 298].) " 'There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances . . . and on the total atmosphere of the case.' " (*People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2

Cal.Rptr. 14, 348 P.2d 577], and see authority there collected.) ■ Under the foregoing criteria, the "facts and circumstances. . . the total atmosphere" of this case, we are of the opinion that no reasonable trier of fact could conclude other than that the here criticized police conduct was reasonable, and thus without Fourth Amendment fault.

But there are further considerations.

■ "As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate." (*People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961]; and see *Terry* v. *Ohio* (1968) 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-907, 88 S.Ct. 1868].) ■ In our continuing discussion, we appraise the reasonableness of the detective's conduct in relation to the facts available to him at the time he seized the paper bags.

■ It is often held that the test of an invalid search or seizure is " *'whether the person has exhibited a reasonable expectation of privacy,* and, if so, whether that expectation has been violated . . . .' " (*Dillon* v. *Superior Court* (1972) 7 Cal.3d 305, 310 [102 Cal.Rptr. 161, 497 P.2d 505], italics added; and see *Katz* v. *United States* (1967) 389 U.S. 347, 361 [19 L.Ed.2d 576, 587, 88 S.Ct. 507], conc. opn.; *People* v. *Bradley* (1969) 1 Cal.3d 80, 84 [81 Cal.Rptr. 457, 460 P.2d 129]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1104 [80 Cal.Rptr. 633, 458 P.2d 713].)

■ Here it was clear to the detective that the fleeing burglars had *exhibited* no "reasonable expectation of privacy" in regard to the paper bags and other debris left behind by them in plain view of all who might enter the vacant premises through the holes they had cut, or the open rear door, or otherwise. Nor had the premises' owner or other rightful possessor appeared to exhibit a reasonable expectation of privacy in the vacant and empty store. ■ And a burglar's right to object to the introduction of evidence seized from a third person (see *Kaplan* v. *Superior Court, supra,* 6 Cal.3d 150, 155), does not exist where the third person is one of the burglary's *victims.* In such a case the right of privacy is not violated, it is protected; and "there is no illegal seizure of which [the burglar] may vicariously complain." (*People* v. *Solario* (1977) 19 Cal.3d 760, 764 [139 Cal.Rptr. 725, 566 P.2d 627].)

Moreover, the seized paper bags and debris had, patently to the trained detective, been left behind and abandoned by the departing burglars. There was no reason to believe that the vacant store's rightful possessor had any property right or claim to them. ■ A search and seizure of abandoned property is not unlawful. (*Abel* v. *United States* (1960) 362 U.S. 217 [4 L.Ed.2d 668, 80 S.Ct. 683]; *People* v. *Siegenthaler* (1972) 7 Cal.3d 465, 470 [103 Cal.Rptr. 243, 499 P.2d 499]; *People* v. *Smith* (1966) 63 Cal.2d 779, 801 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Tuck* (1977) 75 Cal.App.3d 639, 646 [142 Cal.Rptr. 362].)

■ And here the detective, reasonably observing a nexus between the paper bags and the burglaries, concluded that the bags had probable evidentiary value. He "felt that the perpetrators . . . had brought the bags into the vacant store," and that they should "be processed for latent fingerprints." ■ "[I]t is reasonable, within the terms of the Fourth Amendment, to conduct otherwise permissible searches for the purpose of obtaining evidence which would aid in apprehending and convicting criminals." (*Warden* v. *Hayden* (1967) 387 U.S. 294, 306 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642].) ■ And, of course, seizure of such evidence without a warrant will, in a case such as this, be valid in respect of property in plain view of an officer standing where he has a right to be. (*Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992]; *People* v. *Superior Court (Peck)* (1974) 10 Cal.3d 645 [111 Cal.Rptr. 565, 517 P.2d 829]; *People* v. *Block, supra,* 6 Cal.3d 239, 243; *Jackson* v. *Superior Court* (1977) 74 Cal.App.3d 361, 366 [142 Cal.Rptr. 299].)

■ But perhaps the most important consideration of all in determining whether otherwise admissible evidence shall be suppressed is the purpose, or intent, or good or bad faith of the government agent in searching for, and seizing it.

"[T]he purpose and flagrancy of the official misconduct are . . . relevant." (*Brown* v. *Illinois* (1975) 422 U.S. 590, 604 [45 L.Ed.2d 416, 427, 95 S.Ct. 2254], fn. omitted.) The law "cannot realistically require that policemen investigating serious crimes make no errors whatsoever. . . . Before we penalize police error, therefore, we must consider whether the [exclusionary] sanction serves a valid and useful purpose." "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses

much of its force." (*Michigan* v. *Tucker* (1974) 417 U.S. 433, 446-447 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357].)

"In cases in which this underlying premise [of bad faith or negligence] is lacking, the deterrence rationale of the exclusionary rule does not obtain, and [we] can see no legitimate justification for depriving the prosecution of reliable and probative evidence." (*Brown* v. *Illinois, supra,* 422 U.S. 590, 612 [45 L.Ed.2d 416, 432], conc. opn.)

The exclusionary rule is based upon the " ' "imperative of judicial integrity" ' " mandating that, " '[u]nder our Constitution no court, state or federal, may serve as an accomplice in the *willful transgression* of "the Laws of the United States," laws by which "the Judges in every State [are] bound. . . ." ' [¶] . . . [I]f the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integrity' is not offended by the introduction into evidence of that material . . . ." (*United States* v. *Peltier* (1975) 422 U.S. 531, 537 [45 L.Ed.2d 374, 381, 95 S.Ct. 2313], italics added; and see *Lee* v. *Florida* (1968) 392 U.S. 378, 385-386 [20 L.Ed.2d 1166, 1172-1173, 88 S.Ct. 2096].)

 In the case at bench the detective had manifested no purpose of "willful transgression" of the Fourth Amendment. His conduct throughout disclosed nothing other than a conscientious "good faith" purpose to enforce the law and to bring the vacant store's burglars to justice. Nor, in our opinion, may his efforts reasonably be described as, "at the very least negligent, conduct . . . ." As we have pointed out, it fully comported with law. And were we to assume, which we do not, that under the complex rules and divergent views and interpretations of the law of "search and seizure," the detective had erred, it may not reasonably be said that he was negligent. For on a subject where judges and scholars disagree a policeman's good faith decision may not rationally be faulted.

The judgment (as to defendant Hadzima) and the orders granting probation (as to defendants Newell and Donohue) are, and each is, affirmed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied June 12, 1979.