Filed 2/13/15  P. v. Ambriz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>ELEZAR MORALES AMBRIZ,<br><br>        Defendant and Appellant. | F066100<br><br>(Super. Ct. No. BF123681A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Maureen L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Elezar Morales Ambriz was convicted by jury of first degree murder (Pen. Code, § 187, subd. (a)).  The jury found true special allegations that he personally used a firearm (§ 12022.5) and discharged a firearm causing great bodily injury or death

(§ 12022.53, subd. (d)). The trial court sentenced defendant to a total term of 50 years to life.

On appeal, defendant contends the trial court erred in admitting prior acts of misconduct as impeachment evidence during trial. He further claims the errors violated his right to due process of law. We conclude the erroneous introduction of evidence was prejudicial and reverse the conviction.

**FACTS**

On May 9, 2008, the victim Juan Ponce (also known as Lucadio Galvan) was visiting Celso Ambriz[1] at his home. The victim visited Celso on most days after work, and the two men would sit and converse on the porch. On the day in question, the victim and Celso were sitting on the porch talking when a red vehicle pulled up and parked in front of Celso's home. It was evening, and although the porch light was on, there was not much light. A man, whom Celso later identified as defendant, called out and asked if the men wanted a drink. He then walked up to the porch carrying a bottle inside of a paper bag. Defendant offered Celso a drink from the bottle, which he accepted. Defendant also offered the victim a drink, but he declined. Celso testified he did not know defendant. Celso noted defendant also took a drink from the bottle. Afterwards, defendant set the bottle down on the porch.

While on the porch, defendant asked the victim to accompany him to his car. The victim appeared serious and scared. Defendant walked to the driver's side of his car and the victim stood across from him on the passenger side of the car. The men spoke for a few minutes, but Celso could not hear what was being said. Subsequently, Celso observed defendant open the door, reach inside, and he heard shots a few seconds later. After the shooting, defendant walked back toward the gate, stopped, and then ran back to the car and drove away.

---

[1]Due to familial relationships, a number of witnesses share last names. To avoid confusion we will refer to the witnesses by their first names. No disrespect is intended.

2.

Celso, who was blind in one eye, noted defendant stood within two feet of him on the porch. Although he had never seen defendant before that day, he was sure he was the person who had shot and killed the victim. Celso was subsequently shown a photographic lineup and he identified defendant as the shooter. After he identified defendant, he learned defendant knew his father in Mexico. The last time Celso had visited Mexico was in 1993. Celso was 56 years old at the time of trial.

Celso's son Josue was 14 years old at the time of the murder and was inside the house when the shooting occurred. Josue testified he saw a red car pull up in front of the house and later observed defendant walk to the porch. Sometime later, he heard gunshots and looked outside to see the car leaving. He did not see the actual shooting and told the 911 operator he did not see the shooter.

Josue testified he saw defendant come by the home on two occasions prior to the shooting and ask for Celso by name. Josue had never seen defendant prior to these occasions. Defendant was not a family friend. Josue did not tell his father about seeing defendant until the day after the shooting, after he had spoken to the police. He did not tell police about seeing defendant prior to the shooting until approximately one and a half years later. At that time he identified defendant in a photographic lineup.

Jose Diaz lived across the street from the shooting along with his wife Tiffeny Guajardo. On the night in question, he observed a red car drive up and ultimately park in front of Celso's house. The car had stopped at the curb at a few other locations on the street prior to parking in front of the house. He observed a man exit the car and walk up to the porch where Celso and the victim were sitting. The man was on the porch for a short time. He had a bottle in a bag, which he set down before walking back to the car with the victim. The man approached the driver's side of the car and the victim stood on the passenger side. A short time later, Diaz heard shots and ducked. When he looked up, the car was leaving and the victim was lying on the ground. Diaz never got a good look at the shooter.

Diaz admitted he had been using methamphetamine at the time and did not want to speak to the police or be a witness in the case. He also stated he has had memory problems since his overdose. He did not tell the officers on the night of the incident that he saw the shooter walk up to the porch; he had not really thought about it at the time and was only answering the questions asked by the officers. Diaz denied telling a defense investigator that he never saw the shooter go onto the porch. At trial, Diaz recalled that when the shooter approached the porch, he was carrying a bottle in a paper bag, which he set down on the porch. Diaz provided similar information to a district attorney investigator in April of 2012, four years after the shooting. Diaz had not provided this information previously.

Sheriff's deputy Ryan McGee was the first to respond to the shooting. He observed the victim lying on the ground with gunshot wounds to the chest. He had no pulse at the time. McGee also observed a bottle of tequila in a paper bag on Celso's porch. These items were later collected as evidence. McGee was unable to interview any witness at the time because he did not speak Spanish.

Sergeant Adrian Olmos, a homicide detective at the time, was the lead investigator of the murder. He was dispatched to the scene and interviewed Celso on the night of the shooting. The interview was recorded. Celso explained he did not know the person who had shot the victim; however, he did note the shooter had left a bottle on the porch. Olmos also interviewed Diaz, who stated he had not seen the shooting.

According to the pathologist, the victim died from multiple gunshot wounds to the torso. The victim did not have any alcohol or drugs in his system when he died.

Fingerprint technician Kimberly Cook processed the paper bag and tequila bottle recovered from Celso's porch for fingerprints. Cook found a fingerprint belonging to Celso on the paper bag and two prints belonging to defendant on the bottle. Additionally

4.

genetic profile testing performed on the tequila bottle revealed defendant's DNA[2] on the rim of the bottle. Shell casings recovered at the scene were also processed for fingerprints but no prints were located.

*Defense Case*

Maria Diaz lived across the street from Celso at the time of the shooting. She testified she had been outside and ducked when she heard the shots. She previously told the police she looked up and saw the shooter get into the vehicle and leave. She later recalled, however, that the shooter had run from the front of the car. She did not know whether the shooter had gone up to the porch prior to the shooting; she had not paid much attention to him prior to the shooting.

Luis Borego, who was 14 at the time of the shooting, also lived across the street from Celso. He was inside at the time of the shooting and heard the shots. He recalled a three- to five-minute gap between the time the car pulled up in front of Celso's home and the time he heard the shots. Likewise, Tiffeny Guajardo, who also lived across the street, was inside when she heard the shots. She recalled a three- to four-minute gap between the time she saw the car parked in front of Celso's home and the time she heard the shots.

Elvaria Villegas, Celso's wife, testified Celso never told her he knew defendant from Mexico. She recalled that a few days after the shooting, her son Josue told her he had seen the shooter come to the house prior to the shooting.

Israel Ambriz, defendant's brother, was in Mexico in 1993 when the family had a large party. He recalled defendant and Celso speaking with each other at the party. The party consisted only of family members, and there were approximately 75-90 people

---

[2]The chance that a particular person would have the exact DNA profile was 1 in 870 quintillion (870,000,000,000,000,000,000) in the Hispanic population. The prints and DNA were identified as belonging to Jose Israel Zavala, however, the testimony established Zavala was, in fact, defendant.

5.

present. The family is so large Israel does not know everyone's name. Israel is aware defendant and Celso are related.

Crisanto Ambriz is one of defendant's cousins. Crisanto also knows Celso from working with him in the fields. Crisanto recalled an incident in 2007 where he was speaking with defendant on the street and Celso was walking by and stopped to talk to the men. The men spoke for a few minutes before going their separate ways.

Maria Ponce is defendant's half sister. They share the same father, who was 100 years old at the time of trial. She explained her husband is Celso's cousin and that Celso and defendant are also related.

Apolinar Rodriguez and Elena Duque allowed defendant to live with them in 2008. Defendant lived with them for approximately 10 to 12 months. Rodriguez testified he had not seen defendant in possession of a gun during the time he lived with them. Duque noted defendant drove a gray Jeep. Duque explained Celso is her uncle inasmuch as he is her father's cousin. Coincidentally, defendant was also her uncle and the victim was her uncle by marriage. Duque has a large family and does not know everyone in the family.

Defendant testified he had known Celso since 1993. The two spoke at the party in Mexico in 1993 and since then defendant had seen Celso once in 2007 and four times in 2008. On the day of the murder, defendant went to Celso's house at about 4:30 in the afternoon to take Celso a bottle of tequila, as is "[c]ustomary as family," and also so the two could share a drink. The two men spoke for about a half an hour and then got into an argument over a $300 debt defendant owed Celso. Defendant had owed Celso the money since 1993. Additionally, the two argued because defendant had been working as an informant with the Fresno DEA (Drug Enforcement Administration). During the argument, Celso called defendant a "snitch" and told defendant to leave and never come back. Fearing Celso would hit him, defendant left in his gray Jeep Liberty. Defendant stated the victim was not present at the home at the time he argued with Celso.

6.

On cross-examination, the prosecutor asked defendant if he had killed a man, Leonardo Gomez Galvan, in Mexico in 1997. Defendant responded he had defended himself. Defendant admitted he had told the police he killed the man and further admitted he had been sentenced to 14 years but escaped from prison. During the exchange, defendant continued to claim he had only killed in self-defense and asked to show the jury wounds on his stomach from where he had been shot. Subsequently, the prosecutor was allowed to ask defendant if he had actually received the wounds when he was shot in the back in the course of raping his ex-wife. Defendant denied this was how he had received the wounds.

Defendant admitted on cross-examination that when he was arrested in June of 2008 he gave the officers a false name[3] "[j]ust because" and it was "not the first time that [he had] changed [his] name." Defendant denied knowing he was wanted for murder when he was arrested and claimed he thought he had been arrested because of an outstanding driving under the influence charge, even though he acknowledged he was arrested at gunpoint. He acknowledged that when he was arrested the officers told him they were going to ask questions about the shooting of the victim, whom they identified by name. Defendant denied knowing the victim in this case and admitted he had told the officer he had never been to the location of the shooting. The officers had told him the address of the shooting, showed him the location of the shooting on a map, and further showed him pictures of the home. Defendant told the officers he had never been to the home, even though he recognized it as Celso's home, because he thought something had happened to Celso and he knew they had argued that day. This was so even though he admitted the officers never used Celso's name, he had not heard of anything happening to Celso between May and June of 2008, and he was living with Celso's niece at the time. He admitted he lied to the officers about never being at Celso's home.

_____

[3]Defendant identified himself as Gregorio Duque Cardenas, and apparently had some identification bearing that name.

Defendant admitted that when he was interviewed the officers told him they had found a bottle with his fingerprints and DNA on it. Defendant admitted telling the officer he had bought four bottles of tequila and given them to someone on the street. When asked if that was a lie, defendant responded, "I don't know what you want to call it." Defendant gave several evasive answers, saying he could not remember the conversation, but ultimately claimed he had indeed bought tequila for someone on the street. Defendant alternatively stated he could not remember the entire conversation he had with the officers, and he had told the detectives he bought the bottles and had never been to the house because he wanted them to help him investigate and also because he was scared and confused. Defendant admitted lying to the detectives on several occasions in the interview.

Regarding the bottles, defendant claimed he bought four bottles of tequila and gave them to someone named Antonio. When asked if he had told the detectives he bought the tequila for someone named Guero, defendant said he may have said that but he just called him Whetto. He bought the bottles "[j]ust because [he] wanted to give [them] to him." The bottles cost him approximately $60. When asked if he had originally told the officers the man wanted money but he bought him tequila instead because he didn't want the man to use the money for drugs, defendant said he was confused when he was talking to the police. Defendant denied taking a drink out of one of the bottles before giving them to the man, but admitted he may have told the officer he took a drink from one of the bottles to keep the man from selling them for drugs. Defendant alternatively said he did make the statement, that he did not remember, and he was confused. Defendant denied telling the officers this to explain why his fingerprints were on the bottle, rather he told the officers about buying the bottles so they could "help me to investigate."

During the interview, the detectives had told defendant his fingerprints were found on the shell casings recovered at the scene. Defendant admitted telling the officers he

8.

had seen a gun a few days prior and he had unloaded and reloaded the gun. He claimed he said that "to see if they would let me go" but admitted the statement was a lie. Defendant claimed he had not actually touched a gun. Defendant claimed not to know about guns.

When asked if he went to Celso's house to shoot the victim, defendant replied, "No. Prove to me with the gun—find the gun."

On redirect examination, defendant showed the jury a scar on his stomach from where he had been shot. He explained the scar on his stomach was from the operation and he had actually been shot in the back. Defendant further stated he had worked for the federal government and for Fresno as an informant and his handler was Juan Galvan.

Defendant denied killing the victim.

Jolene Dugan testified she heard an argument coming from Celso's house on the day of the shooting, however, she noted that was not unusual. Fresno Police Officer Juan Galvan testified he worked in narcotics enforcement and defendant had been a confidential informant for him in the past. The last time he had worked with defendant was approximately 1997-1998. He explained being an informant can be dangerous work and an informant can be harmed or get killed.

Defense investigator Victor Lostaunau testified regarding several inconsistent statements of prior witnesses. Specifically, he testified Jose Diaz had told him in a prior interview that he never saw the shooter approach Celso's porch. Additionally, Celso's wife told him Celso had told her he knew defendant from Mexico when he was younger. Borego had told him he never saw anyone approach the porch prior to the shooting. Tiffeny Guajardo also had told him she never saw the shooter approach the porch; rather, the shooter yelled something and the victim came to the car.

*Rebuttal*

Detective Raul Murillo interviewed defendant after he was arrested. During the interview, defendant claimed he had bought tequila for a person on the street and took a

9.

drink out of the bottle prior to giving it away.  This was in response to the detective informing defendant his fingerprints were found on the bottle left at the scene.

During the interview, defendant denied ever being at Celso's home, even after being shown a map and pictures of the home.  At one point the detective gave defendant a soda but defendant refused to drink it, saying the officers could have given him something to make him talk.  Defendant refused to drink the soda until the detective first took a drink from it.  The detective lied to defendant and told him his fingerprints were found on the shell casings at the scene.  In response defendant said he had touched a friend's gun and he had loaded and unloaded the bullets from it.

Toward the end of the interview, Detective Murillo told defendant he could not deny being at Celso's home because his fingerprints had been found there.  Defendant responded that "not even I believe what I say what happened."  Defendant later said that if he felt he "need[ed] to take the blame for something," he would "change the version any way."  Defendant denied killing the victim  and later said he could not explain what happened.  When asked why not, defendant said, "I will tell you why not, because I am admitting that I touched the gun.  You understand?"

## DISCUSSION

*Trial court proceedings*

Prior to trial there were in limine motions to admit impeachment evidence should defendant testify.  The issue was deferred to allow the parties to gather more information.

During trial the parties addressed what evidence would be admissible to impeach defendant should he testify.  The parties also addressed what evidence would be admissible to rebut testimony by Apolinar Rodriguez that in the year preceding the murder, defendant lived with him and he had never seen defendant with a gun.[4]  The

---

[4]During trial the following exchange took place:

"[DEFENSE COUNSEL:]  Okay.  And, sir, in the time that he lived with you, how long had he been living there with you?

10.

court determined the testimony by Rodriguez constituted "character evidence" for not possessing firearms.

As to the issue of impeachment, the prosecutor argued he should be allowed to impeach defendant with his admission he had previously escaped from prison after being sentenced to 14 years, and he was sentenced to prison for a killing in which he used a firearm. The prosecutor explained defendant had admitted to the officers he had killed another with a gun. The prosecutor also sought to admit an incident from 1998 where defendant was charged with homicide.[5]

Regarding the killing, the prosecutor explained he did not have any documents confirming the conviction. Rather, he proposed proving the prior conduct through defendant's admissions to the officers. The prosecutor read to the court the following exchange from defendant's interview:

> "[DETECTIVE:] Like you said in Mexico, that happened for a reason.… He was going to kill you first, and you defended yourself. Am I correct, yes or no?
>
> "[DEFENDANT:] Naw, but it was because I looked for it. He wanted to kill me because I looked for it. I turned in some people who were selling drugs, and they were doing bad things to me.
>
> "[DETECTIVE:] How much time—how much time did you get over there?
>
> "[DEFENDANT:] It was a while. It took me seven years.
>
> "[DETECTIVE:] But how much more?

"[RODRIGUEZ:] He lived with us from 10 to 12 months.

"[DEFENSE COUNSEL:] The ten to twelve months that [defendant] was living with you, did you ever see him with a gun?

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: That's overruled.

"THE WITNESS: No."

[5]This incident was ultimately excluded.

"[DEFENDANT:] I needed seven more.

"[DETECTIVE:] Oh, yeah. They gave you 14 years?

"[DEFENDANT]: Uh-huh. But I would get out at ten or some shit.

"[DETECTIVE:] More than half?

"[DEFENDANT:] Uh-huh."

Additionally, the prosecutor provided the following colloquy:

"[DETECTIVE:] We already know the reason you were in jail in Mexico. We already know that. We already know what you were capable of doing.

"[DEFENDANT:] Uh-huh.

"[DETECTIVE]: Okay.

"[DEFENDANT:] Yes, they did find me guilty in Mexico.

"[DETECTIVE:] Yes. What what happened in that case?

"[DEFENDANT:] They declared me guilty. I came from over there. I got out of jail. I escaped. I was in prison for the same reason."

Defense counsel conceded defendant admitted the escape and argued if it was introduced it could be done in a way that was not prejudicial.[6] Regarding the prior killing, defense counsel argued defendant provided an explanation of self-defense.

According to the information available, the escape took place between 2003–2005. The court found the escape was a crime of moral turpitude, although defendant did not

---

[6]Specifically he stated:

"With respect to the first issue that the People seek to admit, as to whether my client, by his own admissions, has stated that he escaped, we do have what was offered by my client to law enforcement, and if he does testify it is an admission and it is evidence that he solicited.

"He can be asked, did you—while you were in Mexico did you escape?

"There is a manner of introducing it that's not too prejudicial or he can answer it, and if he says no, then they would have to impeach him with the officer so those are pretty standard rules."

appear to have been convicted of that crime. The court found that because the conduct involved moral turpitude, defendant could be impeached with that conduct. The conduct was not so remote in time that exclusion would be required pursuant to Evidence Code section 352. Furthermore, the conduct was not similar to the charged offense, nor was the conduct so prejudicial that exclusion was required. The impeachment was limited to asking defendant whether he escaped from prison in Mexico, and assuming he admitted it, no further inquiry would be allowed.

As to the prior killing, it took place in 1997. Based on defendant's statement he had been convicted and sentenced to 14 years, as well as authority holding a conviction for homicide in Mexico is the equivalent to second degree murder, the court found the incident constituted a crime of moral turpitude. The court further explained:

> "Normally, if a conviction were offered for purposes of impeachment, I would prohibit further questioning as to the underlying circumstances stated by the defendant or, for that matter, anyone else as to what took place. In this case I would not do that here, because the circumstances are slightly unusual, and the fact of the conviction is being proved up by [defendant's] own admissions and that both parties, not really under these circumstances I don't think, through any fault of their own, but just because of the difficulty involved in obtaining the material, do not have either the typical rap sheet information or certified documents of a conviction that we would have if the case had occurred in this State, in California, which we might have had if it occurred in another state in the United States.…

> "The question with regards to that is under Evidence Code Section 352, as impeachment material, should that be prohibited or should that be excluded for purposes of impeachment or sanitized on the ground that it is more prejudicial than probative."

The court found the crime was not remote because although the crime occurred in 1997, defendant was convicted and served a prison term, escaping in 2003. As to the issue of prejudice, the court ruled as follows:

> "As to the issue of whether or not the nature of the conviction itself is unduly prejudicial or inflammatory, certainly in a case involving murder charge there is some additional prejudicial value to the fact that there is a

13.

prejudicial effect to the fact that this is a homicide, okay, that would be offered for purposes of impeachment that normally the Court might under most circumstances tend to find would cause it to soon sanitize that previous conviction or act.

"As to the final issue relating to impeachment, which is is there such a multiplicity of convictions, that the Court would be inclined to exclude one on the ground that the sheer number of convictions offered or acts offered, more accurately, since the escape isn't a conviction, would tend to prejudice the jury. I don't find that two even for fairly serious offen[s]es, is such a multiplicity of prior acts or convictions that I think that alone would outweigh the—or eliminate the jury's ability to properly consider the evidence on the basis of appropriate instructions and use it in its proper context.

"Normally what I would probably do if the previous homicide were being offered solely for purposes of impeachment is permit—is require it to be sanitized and offered only as a previous felony conviction involving moral turpitude; however, these circumstances are a little bit different, because those circumstances are offered not only for purposes of impeaching the defendant's credibility but separately as rebuttal evidence to character evidence for trait of character lacking for or tending not to possess firearms.

"As I understand it, the description of the incident given in the statements by [defendant], though in some respects exculpatory description by his statement, is in fact one that involved the use of a firearm. [¶] Is that correct counsel?

"[DEFENSE COUNSEL]: Yes, Judge.

"THE COURT: Under those circumstances I think it has separate and greater probative value as rebuttal character evidence for trait of character of—the offered trait of character of not possessing firearms. It's relevant to rebut that.

"And so in this particular case I'm going to find that the probative value, because it's coming in for two purposes, one of which it is relatively useless if it is sanitized—not relatively useless, it's completely useless if it's sanitized, and that's not fair to the offering party—I am going to not sanitize it in this particular incident and I'm going to find that the probative value outweighs the prejudicial effect.

14.

"So I will permit [defendant] to be asked if he was sentenced to prison in Mexico for a shooting in which he killed another individual. I would permit the name of that individual to be used and, frankly, counsel at this point, since it's coming in any way, if either party feels the evidence demonstrates that is somehow relevant to the issue of motive either positively or negatively, if there is evidence from which that individual can be connected to the alleged victim in this case, that may be come can also [*sic*].…

"I will, however, also permit defense counsel, should he choose to do so, to question [defendant] as to [defendant's] version of what those events were involved in that underlying case and also to inquire of the officer, should the People call him, and I suspect they will in rebuttal, as to say what [defendant's] statements were in that regard, also.

"So basically, more or less, a short version of that is because it's coming in both for impeachment and as rebuttal of character evidence on the firearm issue, both of you can go into it if you wish to do so, but since it's coming in kind of unlimited I'm not going to restrict it to just evidence of the conviction coming in, because I don't think that's proper on character issue, and also, because in fairness, since the conviction is being proved up by [defendant's] admission, I think both parties should be able to inquire as to what he says now and what he said in the interview regarding that subject."

The court excluded evidence of a third homicide occurring in 1998 for which defendant had been charged but not yet tried, explaining defendant had only been charged with the crime, not convicted, and the facts appeared to be especially heinous. Additionally the testimony would consume an undue amount of time as it would have to be proven up through witness testimony. Further, the cumulative effect of the multiple incidents would "strain the ability of even a highly conscientious jury to use that evidence only for its proper purpose and not simply conclude [defendant] should be convicted because there is substantial evidence that he has killed on previous occasions, and that's, of course, a particular concern here, because this is a murder case and this is a close similarity, if not identity to the charges." Ultimately the court excluded evidence of the 1998 homicide as the probative value of the evidence as to impeachment and to defendant's character for having a firearm was outweighed by the prejudicial effect.

However, the trial court explained that should the defense adduce further character evidence as to gun possession, it would be inclined to revisit the admissibility of the 1998 homicide. The court noted that the reason it was allowing the prior homicide was because it believed "the door has been opened on the issue of character evidence, possession—the trait of character for possession of a firearm. The door is open. It can't be closed, but the evidence given thus far is not of such a character that it suggests, for example, that [defendant] has never ever possessed a firearm or anything of that nature."

At one point, the prosecutor asked the court to reconsider its ruling as to the 1998 homicide. He suggested the event could be sanitized to just show defendant was observed with a firearm and a bandolier of bullets so the evidence could be used as character evidence on the issue of possessing firearms without the prejudice of the homicide. The court declined the prosecutor's invitation, noting the "quite substantial" prejudicial effect of the evidence "especially given what I've let in."

Defense counsel objected to the admission of the prior homicide, noting there was no evidence defendant had ever been convicted of a homicide; rather, the information was solely based upon information provided by the prosecutor. Defense counsel acknowledged defendant had told the police he killed someone, but that does not necessarily imply a crime of moral turpitude, and defendant stated he acted in self-defense. The court explained it ruled the conduct was admissible for impeachment because the "case law indicates it is equivalent of a California conviction for second degree murder." Had the statute been such that it was equivalent to a crime that did not involve moral turpitude, the court would not have been inclined to admit it for impeachment.

***Impeachment with the prior conduct in Mexico***

Defendant contends the impeachment evidence was not admissible because the prosecution never "establish[ed] the necessary preliminary fact that the purported murder for which [defendant] was convicted in Mexico was a crime of moral turpitude." He

16.

claims his admission did not constitute a crime of moral turpitude. Furthermore, because the prosecution did not produce any documents demonstrating defendant suffered a prior conviction nor any description of the homicide laws in Mexico, there was no way to determine whether the crime defendant committed in Mexico constituted a crime of moral turpitude in California. Defendant further argues the evidence regarding his prior escape from prison in Mexico was not probative of the issue of his credibility and was unduly prejudicial. We find defendant's arguments unpersuasive.

In determining whether past misconduct may be admitted for purposes of impeachment we consider whether the "'conduct evinces moral turpitude.'" (*People v. Ayala* (2000) 23 Cal.4th 225, 273.) Moral turpitude is defined as a "'readiness to do evil.'" (*People v. Castro* (1985) 38 Cal.3d 301, 314, italics omitted.) Conduct involving dishonesty necessarily encompasses moral turpitude. (*Id.* at p. 315.) However, crimes of violence also indicate the trait, although not as heavily. (*Ibid.*; *People v. Rist* (1976) 16 Cal.3d 211, 222, superseded by statute on other grounds in *People v. Collins* (1986) 42 Cal.3d 378, 393.)

Defendant initially argues the trial court erred in allowing the impeachment evidence because the prosecutor failed to produce any evidence defendant suffered a prior conviction for a killing. Defendant's argument fails to acknowledge there is no requirement that the conduct used to impeach a witness's credibility resulted in a felony conviction. While the court in *People v. Castro*, *supra*, 38 Cal.3d 301 explained felony convictions evincing moral turpitude were admissible as impeachment evidence, nothing in the opinion limited impeachment evidence to felony convictions. Rather, where a prior felony conviction is used as impeachment evidence, the conviction is only admissible where the least adjudicated elements demonstrate moral turpitude. (*Id.* at pp. 316-317.) Later, in *People v. Wheeler* (1992) 4 Cal.4th 284, the court explained California Constitution, article I, "section 28(d) makes immoral conduct admissible for impeachment whether or not it produced any conviction, felony or misdemeanor.…

17.

Thus, impeaching misconduct now may, and sometimes must, be proven by direct evidence of the acts committed." (*Id.* at p. 297, fn. 7.)

For example, in *People v. Lepolo* (1997) 55 Cal.App.4th 85, 88, the prosecutor was allowed to impeach the defendant with an incident where he had held a machete over his head, waving it toward a uniformed police officer, threatening him. The trial court had determined in limine after reviewing evidence of the defendant's prior conduct that the incident constituted conduct indicating moral turpitude. On appeal, the defendant claimed the impeachment evidence should have been confined to the "least adjudicated elements of the crime of brandishing a weapon." (*Id.* at p. 89.) The *Lepolo* court disagreed, explaining that when prior conduct did not result in a conviction, it is permissible to inquire into the facts of the misconduct. There the defendant's prior conduct constituted a brandishing, but also constituted a criminal threat (§ 422). There was no reason to limit the conduct to the least adjudicated elements of a conviction because there was no prior conviction. The court explained "[w]hether the trial court admits evidence of past misconduct should be determined solely on the basis that that conduct evinces moral turpitude. The label is not important—the conduct is." (*People v. Lepolo*, at pp. 89-90.) As the conduct demonstrated moral turpitude, it was properly admitted. (*Id.* at p. 91.)

Therefore, the question here is whether defendant's underlying conduct demonstrated moral turpitude. The conduct at issue comprised defendant's admission to shooting and killing another human. In discussing whether the conduct would be admissible, the prosecutor explained his basis for believing the prior conduct occurred was defendant's statement. The prosecutor pointed out that when defendant was asked about the prior killing in Mexico he said he "looked for it. He wanted to kill me because I looked for it. I turned in some people who were selling drugs, and they were doing bad things to me." During trial, defendant explained he turned in people who were selling

18.

drugs and they were doing bad things to him. He further admitted he had luck on his side because he had a better gun than the victim.

Based on defendant's admission to police, it was apparent he admitted he had killed a person during a shooting. While it is unclear from defendant's statement whether the shooting was in self-defense ("he wanted to kill me") or unprovoked ("I looked for it"), it is clear the shooting was intentional. Thus, the issue becomes whether an unlawful, intentional killing qualifies as conduct evincing moral turpitude. We conclude it does.

In *People v. Coad* (1986) 181 Cal.App.3d 1094, 1110, the court held the crime of voluntary manslaughter necessarily involves moral turpitude. This is because it is the intentional taking of a life without justification or excuse. (*Id*. at pp. 1108-1109.) The killing itself is required to be unlawful. (*Id*. at p. 1111.) Likewise, in *People v. Parrish* (1985) 170 Cal.App.3d 336 this court held a prior conviction for voluntary manslaughter is admissible under *Castro*. We explained:

> "[T]he intentional taking of a human life, whatever the excuse for doing so, involves the intent to do harm to another. The intent to do evil is always involved in the intentional taking of a human life. Accordingly, … voluntary manslaughter necessarily involves moral turpitude within the meaning of that term as used in *Castro*." (*People v. Parrish*, *supra*, at p. 351.)

In reaching this conclusion, we relied in part upon *De Lucia v. Flagg* (7th Cir. 1961) 297 F.2d 58. There, the court addressed whether a deportation order of Paul De Lucia was supported by the evidence. The record established De Lucia had been convicted of voluntary homicide in Italy prior to his entry into the United States and had been sentenced to imprisonment for three years. (*Id*. at p. 60.) From the record, the court was able to determine the homicide was voluntary. Furthermore the court found "the fact that a sentence was imposed negates any possibility that the killing was justifiable." (*Id*. at pp. 60-61.) Because the killing was both intentional and not justified, the court reasoned the crime constituted one of moral turpitude. (*Id*. at p. 61.) Therefore, the

19.

evidence supported the finding De Lucia had previously committed a crime of moral turpitude.

Similarly here, the prosecutor provided the court with an offer of proof regarding the crime of moral turpitude. Defendant admitted to the officers he had killed someone with a gun when he was in Mexico. He noted "he looked for it" and further claimed the victim also tried to kill him. At trial defendant admitted he killed the victim but claimed he did so in self-defense.

On appeal, defendant argues this conduct does not amount to moral turpitude because it could qualify as self-defense. We disagree. Initially, we note defendant's statements both during his testimony and to the police evince an intentional killing. Defendant stated he killed the victim and that he had the better gun. Nothing in the conduct evinces anything other than an intentional killing. Secondly, although defendant claimed he killed the victim in self-defense, he admitted he was found guilty of the crime and sentenced to 14 years in prison. The fact he was found guilty and sentenced to a prison term indicates the killing was not justified. (See *De Lucia v. Flagg*, *supra*, 297 F.2d at pp. 60-61.) Thus, based on the record before the trial court it appears defendant's conduct amounted to conduct involving moral turpitude.

As to defendant's statement he had escaped prison in Mexico while serving a sentence for the killing, we find this conduct likewise evinces moral turpitude. In *People v. Lang* (1989) 49 Cal.3d 991, 1010, our Supreme Court found the crime of escape without force constitutes a crime of moral turpitude. This is because the conduct of escape, even without force, "necessarily involves either deceit, breach of trust, or stealth to effectuate the escape and a willingness to incur the serious risk of violent injury to law enforcement officers and bystanders typically involved in the process of recapturing an escaped prisoner." (*Ibid*.) Here, defendant specifically noted he had "escaped" from prison in Mexico. We conclude such conduct demonstrates moral turpitude.

20.

Finding defendant's prior conduct demonstrates moral turpitude does not end our inquiry, however. Although conduct evincing moral turpitude is a prerequisite to admissibility, the trial court retains discretion to exclude the evidence pursuant to Evidence Code section 352. (*People v. Castro*, *supra*, 38 Cal.3d at pp. 312-313.) That section provides the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) Defendant argues the trial court erred in failing to exclude the prior conduct evidence pursuant to this provision.

We review the trial court's ruling whether to admit such prior conviction under the abuse of discretion standard. (*People v. Clair* (1992) 2 Cal.4th 629, 655.) A trial court does not abuse its discretion unless its determination "exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

The trial court did not abuse its discretion in determining defendant's prior conduct of killing another and escaping from prison was admissible as impeachment evidence. As we have already explained, because both incidents exhibited moral turpitude, they were relevant to defendant's credibility. Neither was particularly remote, especially in light of the fact defendant apparently served seven years in prison, escaping in approximately 2003. Although the prior killing was almost identical to the conduct for which defendant stood trial, this factor alone is not determinative. (See *People v. Johnson* (1991) 233 Cal.App.3d 425, 458-459; *People v. Dillingham* (1986) 186

21.

Cal.App.3d 688, 695; *People v. Stewart*, *supra*, 171 Cal.App.3d at p. 66.) There were apparently no other crimes or conduct available for impeachment. Furthermore, a series of crimes demonstrating moral turpitude is more probative of credibility than a single offense. (*People v. Holt* (1984) 37 Cal.3d 436, 452-453.) The court considered the fact it was allowing evidence of two prior, serious events. However, the court determined the conduct was not unduly prejudicial. In undertaking its analysis, we note the trial court determined it would exclude a third incident, another more recent homicide. Finally, it does not appear the admission of the prior conduct for impeachment affected defendant's decision to testify as he did, in fact, testify in the case.

We conclude the trial court's ruling both priors were admissible was not an abuse of discretion. In this regard, the case is similar to *People v. Johnson*, *supra*, 233 Cal.App.3d 425. There, the defendant was tried for murder among other charges. The trial court admitted prior convictions for escape, assault with a deadly weapon, and murder. The appellate court found no abuse of discretion, noting there is "no automatic limitation on the number or nature of prior convictions of crimes involving moral turpitude that may be used to impeach a witness." (*Id*. at p. 459.) Although the crime used to impeach was identical to the charged crime, and other convictions were used to impeach the defendant's credibility, the court concluded it was not an abuse of discretion to admit the prior murder conviction so the jury would be fully informed as to the defendant's credibility. (*Ibid*.)

As well here, the prior conduct was relevant and probative on the issue of defendant's credibility. As we will explain below, however, the trial court admitted the evidence on two grounds: as relevant to defendant's credibility and also as rebuttal character evidence regarding his character trait for possessing a firearm. As we will further explain, the admission of the prior shooting as character evidence and the unrestricted nature in which it was allowed at trial constituted prejudicial error.

22.

*Admission of character evidence*

The trial court ruled evidence defendant shot and killed someone in Mexico was admissible not only for impeachment, but also as relevant to rebut evidence of defendant's character regarding possession of a firearm. The trial court ruled defendant opened the door to character evidence by introducing evidence through Apolinar Rodriguez that he had never seen defendant in possession of a gun during the 10 to 12 months defendant lived with him. As a result, the trial court concluded the prosecutor could question defendant regarding his possession of a gun used in the killing in Mexico in 1997. We conclude the trial court erred in admitting the evidence on this ground.

Generally, evidence of a defendant's character or a trait of his character is not admissible to prove the defendant's conduct on a specific occasion (Evid. Code, §§ 1101, subd. (a), 1102). However, when a defendant presents testimony of his good character at trial, the prosecution may impeach the testimony or rebut it. (*Id.*, at § 1102, subd. (b).) Under Evidence Code section 1102, subdivision (a), "[a] defendant may introduce opinion evidence of his or her character to show a nondisposition to commit an offense." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118.) "Lay opinion testimony is admissible under [Evidence Code] section 1102 when it is based on the witness's personal observation of the defendant's course of behavior." (*People v. Felix* (1999) 70 Cal.App.4th 426, 430.)

"When a criminal defendant presents opinion or reputation evidence on his own behalf[,] the prosecutor may present like evidence to rebut the defendant's evidence and show a likelihood of guilt." (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 953.) "[E]vidence of specific acts of the accused [is], as a general rule, inadmissible to prove his disposition to commit such acts [citation]; this general rule is applicable 'even though the defendant has opened the question by introducing evidence of his good character.'" (*People v. Wagner* (1975) 13 Cal.3d 612, 619.)

23.

> "The [general] rule, precluding the admission into evidence of specific acts of conduct to show defendant's bad moral character must, of course, be distinguished from the cross-examination of a *reputation witness*. When a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony. [Citations.] In asking such questions, the prosecutor must act in good faith and with the belief that the acts or conduct specified actually took place. [Citations.] The rationale allowing the prosecution to ask such questions (in a 'have you heard' form) is that they test the witness' knowledge of the defendant's reputation." (*People v. Wagner*, *supra*, at p. 619.)

"'[T]he price a defendant must pay for attempting to prove his good name is to throw open a vast subject which the law has kept closed to shield him.'" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357.)

Likewise, when a witness testifies as to his opinion of the defendant's character, "the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred." (*People v. Hempstead*, *supra*, 148 Cal.App.3d at p. 954.) Such testimony is only admitted for the limited purpose "of determining the weight to be given to the opinion or testimony of the witness." (*Ibid.*)

While a witness who testifies regarding a defendant's character may be cross-examined regarding specific acts of misconduct to test the witness's opinion or knowledge of the defendant's reputation, there is no provision allowing for specific acts of misconduct to be otherwise introduced as character evidence. On this point, *People v. Tuggles*, *supra*, 179 Cal.App.4th 339 is instructive. There, the defendant was convicted of murder. During the trial, a witness for the prosecution testified on cross-examination that the defendant had a reputation for nonaggression. Specifically, defense counsel inquired as to whether the defendant was known for "'just talking'" but would not "'back it up.'" (*Id.* at p. 354.) On redirect, the prosecutor asked if the witness had heard the

24.

defendant had said he wanted "'to shoot up the block.'" (*Id*. at p. 355.) The court ruled the question was proper.

Pursuant to Evidence Code section 1102, subdivision (a), a defendant may introduce "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" in order to "prove his conduct in conformity with such character or trait of character." After such evidence is admitted the "'prosecutor may present like evidence to rebut the defendant's evidence and show a likelihood of guilt.'" (*People v. Tuggles*, *supra*, 179 Cal.App.4th at p. 357.) The rule only allows for the prosecution to admit such evidence after the defense has first introduced the good character evidence. Once the door has been opened, the prosecution's inquiry is limited to questions "asking whether the witness has heard of statements at odds with the asserted good character or reputation. 'The rationale allowing the prosecution to ask such questions (in a "have you heard" form) is that they test the witness'[s] knowledge of the defendant's reputation.'" (*Id*. at p. 358.) Furthermore, the evidence is not admitted for its truth; rather, it is admitted to undermine the witness's testimony regarding the defendant's reputation. Therefore, the questions posed by the prosecutor in *Tuggles* did not constitute hearsay and were properly admitted to rebut the good character evidence. (*Ibid*.)

Unlike the situation in *Tuggles*, the questions posed by the prosecutor regarding defendant's prior use of a gun in Mexico were not admitted to undermine the witness's testimony. Instead of asking the witness whether he was aware of defendant's prior conduct, which would have been proper, the specific incident of misconduct was admitted as character evidence through cross-examination of defendant. But the Evidence Code does not allow for the use of such evidence in that manner. (*People v. Wagner*, *supra*, 13 Cal.3d at pp. 618-619; *People v. Felix*, *supra*, 70 Cal.App.4th at pp. 431-432.) Thus, the trial court's ruling allowing the prosecutor to cross-examine defendant regarding the 1997 incident was improper.

To the extent the People argue the evidence of defendant's 1997 offense was relevant as impeachment of the prior testimony that defendant was not seen by Rodriguez to possess a weapon in the year leading up to the shooting, they are mistaken. While the prosecution would certainly be entitled to rebut the testimony that defendant had never possessed a gun with the 1997 incident where he admitted to shooting someone, such testimony was not adduced in this case. The testimony by Rodriguez was fairly limited; it only established he had not seen defendant in possession of a weapon in the year prior to the murder. A 1997 offense where defendant had a gun provides little impeachment of Rodriguez's testimony. The admission of the prior shooting did not contradict Rodriguez's testimony regarding whether he had seen defendant in possession of a gun in the preceding 12 months. The only relevance the prior possessed was as character evidence, that defendant is the type of person to possess weapons.

Furthermore, it was clear the testimony was admitted as character evidence, not as impeachment. The jury was specifically instructed it had received character testimony regarding defendant's "character trait for not possessing firearms." (CALCRIM No. 350.) The jury was instructed it could consider the evidence and that it was capable of creating a reasonable doubt as to guilt. Furthermore, the evidence could be countered by "evidence of his bad character for the same trait." (*Ibid*.) The meaning and importance of the character evidence was left to the jury.

Additionally, the jury was instructed that defendant had been cross-examined regarding engaging in "certain conduct. These questions and their answers are relevant only to the issues of the defendant's credibility and to whether or not he has possessed firearms in the past. You may consider these questions and answers only as they relate to these issues." (CALCRIM No. 351.)

Thus, the trial court's ruling that the admission of the 1997 incident was admissible to rebut defendant's character evidence was in error. As we have explained, this was only part of the reason the trial court admitted the evidence; the evidence was

also admitted on the issue of defendant's credibility. The court indicated it would have sanitized the conduct were it not being admitted as rebuttal character evidence. Specifically, the court stated the fact the prior was a homicide created additional "prejudicial value," and if the evidence was being admitted solely as impeachment evidence it would normally "require it to be sanitized and offered only as a previous felony conviction involving moral turpitude," but because the evidence was being admitted for two purposes, "one of which … is … completely useless if it's sanitized," it decided not to sanitize the prior and found the probative value outweighed the prejudicial effect. As the details of the escape and murder were inadmissible as character evidence, we conclude the trial court erred in admitting those details for that purpose.

### Admission of prior rape

Defendant contends the prosecutor's questions regarding whether defendant raped his ex-wife upon his escape from prison were improperly admitted and unduly prejudicial. We agree.

### Background

During cross-examination regarding the prior shooting in Mexico, defendant suggested he shot the victim in self-defense. He sought to demonstrate this by showing the jury scars on his torso. Before asking the next question, the prosecutor requested a sidebar conference. After the unreported conference was held, the following exchange took place:

> "[PROSECUTOR] Q. Now, sir, you just about mentioned a scar to us. Isn't it true that you received that bullet wound because, once you escaped from prison, you learned that the person who you had been married to when you went into prison was now married to another man and you went and raped her and then during that rape the husband of that lady came and shot you in the stomach? [¶] Isn't that true?

> "[DEFENDANT] A. No.

> "Q. You never heard of that before?

"A.  No.

"Q.  You didn't receive this bullet wound in a gun fight with Leonardo Gomez [*sic*], did you?  [¶] You received it when you were trying to rape this lady?

"[DEFENSE COUNSEL]:  Your Honor, I'll object as asked and answered.  It's argumentative now.

"THE COURT:  It's overruled.

"[DEFENDANT]:  No."

On redirect examination, defense counsel asked defendant whether the prior shooting was in self-defense and asked defendant to show the bullet wound on his stomach.  Defendant showed the jury his scar and stated he had been shot in the back, the bullet exited his stomach, and his scar was from the operation.

On recross-examination the prosecutor brought up the subject again:

"[PROSECUTOR] Q.  And your bullet wound that you showed us, that's consistent with—would be consistent with getting caught raping somebody's wife and them coming in and finding you and shooting in the back, isn't it?

"[DEFENDANT] A.  Yes.

"Q.  Isn't that true that's what happened?

"A.  I was shot.  They wanted to kill me.

"Q.  'Cause you were raping that lady?

"A.  No.  That's not the way it is."

Subsequently the parties made a record of the sidebar conversation.  Defense counsel stated:

"The People have this wild hearsay argument that my client—that they heard somebody who heard from somebody, we don't have a source, that my client was shot when he was trying to rape his wife.  That's the exception.

28.

"There isn't any support.  There isn't the wife, there isn't an officer that made the arrest, there isn't the victim, nothing, and he was allowed to go into that.  It is highly prejudicial.

"At the appropriate time I will be making a motion for new trial [as] a result of that.  I think it was highly prejudicial.  It shouldn't have come in, and the Court allowed it."

The prosecutor responded:

"[The] People had a good faith belief based on their discovery that the defendant was shot during the rape of his ex-wife.

"And so it's appropriate to—I had a good faith believe [*sic*] it's an appropriate question.  The defense brought it up or brought up the gunshot wound, and I have a right to question him with a good faith belief."

The court explained:

"[Defendant] volunteered in a manner that was not responsive to a question asked that he had injuries which had been suffered as consequence of that incident, which I think he was at least implicitly, strongly implicitly, suggesting, if not explicitly saying, supporting he was acting in self-defense.

"At that point the People did request to be permitted to go into the fact that they are aware of and had a good faith belief based on information that they may have that [defendant] had in fact suffered those injuries during the incident in which he was alleged to have sexually assaulted his wife.

"While recognizing that that is—in character of the evidence incident itself, it is certainly potential inflammatory or potentially prejudicial.  Be that as it may, the issue of the [*sic*] him having the injuries, those being present and what was the reason he had those injuries, was something that was brought up not by [defense counsel] but neither by [the prosecutor] in any of the questions that were asked.  It was volunteered by [defendant] in a manner that was, I'm sure, believed to be supportive of his position and well may be, depending on what the jury concludes, if they do draw a conclusion as to how those injuries were suffered.

"That being the case, however, it was clearly not responsive to the question asked, and I felt it unfair at that point in time that the People not be permitted in inquire of him as to whether in fact those injuries were not suffered in an alternative manner.  So at that point in time I felt the

29.

probative value of that questioning outweighed the prejudicial effect, recognizing that there is some prejudicial effect to that and so I did permit the People to go into it …."

*Analysis*

The record shows the trial court allowed the prosecutor to ask the questions concerning the prior rape to rebut defendant's testimony regarding how he received the scars on his torso. Impeachment evidence, including evidence defendant engaged in criminal conduct, is admissible to rebut a defendant's testimony. (Evid. Code, § 1101, subd. (c) ["Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness"]; see, e.g., *People v. Cooks* (1983) 141 Cal.App.3d 224, 324 [evidence defendant suffered prior conviction for possessing gun admissible to rebut testimony he never possessed a gun]; *People v. Reyes* (1976) 62 Cal.App.3d 53 [defendant who denied being bookmaker on direct examination subject to impeachment with otherwise inadmissible misdemeanor conviction for bookmaking]; *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946 ["[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony"].) This rule prevents witnesses from misleading the jury or misrepresenting facts. (*People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283.) Nevertheless, the admissibility of collateral impeachment evidence is subject to the trial court's broad discretion under Evidence Code section 352. (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Morrison* (2011) 199 Cal.App.4th 158, 163-165.)

Here, it is apparent from defense counsel's comments and the trial court's recitation of the sidebar conference that the trial court concluded the probative value of the questioning outweighed its prejudicial effect. Defendant argues the trial court erred in making this determination. We agree.

We review a trial court's ruling pursuant to Evidence Code section 352 under an abuse of discretion standard. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) "A trial

30.

court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) Even under this deferential standard of review we conclude the admission of the question was error.

The only probative value of the question was to demonstrate defendant's testimony regarding how he received his injury was false. However, the question alone could not establish the testimony was false. Questions themselves are not evidence. (CALCRIM No. 104.) The lack of any evidence to support the claim left the jury with a bare insinuation from the prosecutor that defendant had engaged in a prior rape. This, of course, was highly inflammatory. Generally, it is misconduct for a prosecutor to ask a "witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means." (*People v. Price* (1991) 1 Cal.4th 324, 481, superseded by statute on other grounds in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.) Here, the fact implied by the question (that defendant had received his wound while committing a sexual assault) was never supported by evidence presented to the jury.

It is unclear from the record whether the prosecutor possessed admissible evidence in support of the question or whether the trial court prevented the prosecutor from presenting such evidence.[7] In either case, allowing the question, without the presentation

_____

[7]Although the trial court acknowledged the prosecutor articulated a good faith basis for the question in the unreported bench conference, that basis was never recited on the record. Thus, we are unable to determine whether the prosecutor possessed any admissible evidence to support the claim. Regardless, the trial court also noted when ruling on the motion for new trial that it had ruled the prosecutor was prohibited from presenting any evidence regarding the truth of the question and would be limited to defendant's answer of the question "whatever it would be."

Because the prosecutor sought and received permission to ask the question, the issue presented is whether this was trial court error, not prosecutorial misconduct.

31.

of evidence to support the allegation, was error. (*People v. Perez* (1962) 58 Cal.2d 229, 240-241, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 32-33, overruled on other grounds in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155, fn. 8 [prosecutor's questions of witness insinuating witness had been coerced by defendant without introducing proof of that fact was improper].)

By failing to admit any evidence that would support the facts assumed in the question, the jury was deprived of a means to evaluate whether defendant's testimony was true or false on that point. Despite the lack of evidence on the issue, however, "it would have been natural for the jurors to believe that [the prosecutor] also acted in good faith in all of his other questioning, and had reason to believe the existence of facts which his questioning suggested." (*People v. LoCigno* (1961) 193 Cal.App.2d 360, 388; accord, *People v. Wagner*, *supra*, 13 Cal.3d at pp. 619-620 ["By their very nature the questions suggested to the jurors that the prosecutor had a source of information unknown to them which corroborated the truth of the matters in question"].) Thus, the jury was left with a highly inflammatory question insinuating defendant had engaged in a prior rape without any evidentiary support for the question, and it was further left without any basis for determining how defendant received his scars.

The situation here is akin to that presented in *People v. Perez*. There, the prosecutor asked a witness if he had been threatened but did not then attempt to establish the witness in fact had been threatened nor was there any evidence of a threat. The prosecutor nevertheless suggested in closing argument that the witness was coerced into being silent. The court explained,

> "Since the record is barren of any evidence that the witness … had been threatened in any manner whatsoever, we are impressed that the prosecution should have been prepared to substantiate the inevitable insinuation in the latter question to the effect that [the witness's] testimony had been coerced by defendant or some individual acting on his behalf. [Citation.] Since there was no evidence or offer of proof concerning threats upon [the witness], and since the question was asked of an extremely critical defense witness concerning a key factor in that witness' credibility,

32.

it would appear that the question was improper." (*People v. Perez, supra,* 58 Cal.2d at pp. 240-241.)

Likewise here, the question insinuating defendant had received his wound while committing a prior rape was highly inflammatory. (See *People v. Guerrero* (1976) 16 Cal.3d 719, 730 [defendant entitled to new murder trial as the admission of evidence of an uncharged rape was prejudicial since it branded defendant a rapist].) Because no evidence was introduced tending to prove the accuracy of the question, the question possessed no probative value. As such, we find the trial court's ruling allowing the question constituted an abuse of discretion.

Additionally, we note defendant's denial of veracity of the claim did not reduce the question's prejudicial impact. In *People v. Wagner, supra,* 13 Cal.3d 612, the defendant testified as to his good character. In response, the prosecutor asked a series of detailed questions accusing the defendant of selling narcotics and possessing large amounts of cocaine. The defendant denied the allegations and no evidence was ever produced to substantiate them. Initially, the court determined the manner in which the prosecutor asked the questions was improper. (*Id.* at pp. 616-619.) The court then explained that the fact the defendant denied the conduct contained in the question did not cure the impropriety. "By their very nature the questions suggested to the jurors that the prosecutor had a source of information unknown to them which corroborated the truth of the matters in question. The rule is well established that the prosecuting attorney may not interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given.'" (*Id.* at p. 619.) The court found it was reasonably probable the jury was led to believe the defendant had engaged in the narcotics transactions despite his denials.

As well here, the prosecutor's repeated insinuations that defendant had committed a prior rape led to a reasonable probability the jury concluded defendant engaged in the

conduct despite his denials. Because the admitted line of questioning was highly prejudicial, and without any probative value, we find the trial court's ruling allowing the line of questioning was error.

***The admission of the evidence was prejudicial***

It is well-settled that the standard for admitting improper character evidence or impeachment evidence is to be decided under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting improper character evidence tested by *Watson* harmless error standard]; *People v. Mullens* (2004) 119 Cal.App.4th 648, 658-659 [error in admission or exclusion of evidence following exercise of discretion under Evid. Code, § 352 in considering whether to admit propensity evidence under section 1108 reviewed under *Watson* harmless error test]; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018-1019 ["'erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded'"]; *People v. Escobar* (1996) 48 Cal.App.4th 999, 1025, disapproved on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 923–925 [erroneous admission of character evidence tested by *Watson*].) Under this familiar standard, we ask whether it is reasonably likely the jury would have returned a more favorable verdict had the trial court excluded the evidence. (*People v. Watson*, *supra*, at p. 836.) We find the admission of the evidence constituted a miscarriage of justice.

Defendant argues the admission of evidence indicating he committed a prior murder, escaped from prison, and subsequently raped his ex-wife was so inflammatory that it "virtually ensured that the jury would interpret the evidence at trial in the light most damaging to the defense." We agree.

As we have previously stated, the fact defendant committed a prior killing and escaped from prison were relevant on the issue of his credibility. However, the *details* underlying these offenses were not relevant to the issue of his credibility. (See, e.g.,

34.

*People v. Allen* (1986) 42 Cal.3d 1222, 1268-1270 [when felony conviction is used to impeach, the questioning regarding the prior is limited to date, place, and name or nature of conviction]; *People v. Smith* (1966) 63 Cal.2d 779, 790 [prosecuting attorney is generally not permitted to delve into details and circumstances of prior crime].) Indeed, consistent with this principle, the trial court stated it would likely have sanitized the prior crime as conduct evincing moral turpitude had the evidence not also been admitted as character evidence.

Thus, we are confronted with a situation where the jury unnecessarily learned the details[8] of the prior killing, namely, defendant engaged in a shooting and had the "better gun." Furthermore, instead of just learning defendant had escaped a sentence for some unidentified crime, the jury was informed—through the expanded questioning on the killing and also on the questioning involving the rape—that defendant had escaped from prison while serving a term for the very killing they were discussing. This had the net effect of informing the jury not only was defendant a killer, but he was a killer who was never adequately punished. This, of course, heightened the prejudicial nature of the evidence. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405 [prejudicial effect of uncharged misconduct evidence is heightened when conduct did not result in the criminal conviction because it increases likelihood jury will be inclined to punish defendant for prior conduct regardless of whether it believed defendant was guilty of charged offense].)

---

[8]Although the underlying conduct may be properly admitted where a defendant did not suffer a prior felony conviction (*People v. Lepolo*, *supra*, 55 Cal.App.4th at pp. 89-90), according to the People's offer of proof defendant did suffer a conviction in Mexico for the conduct. However, the People did not have any documents to support the prior conviction. Regardless of whether the People should have been limited to the facts of the conviction or the underlying conduct evincing moral turpitude (here, the unlawful killing of another), the error was the additional admission regarding the details of the prior killing. For instance, the fact defendant used a firearm in the prior offense, claimed the shooting was in self-defense and related to his turning people in for selling drugs, that defendant had luck on his side because he had a better gun, and the fact his escape from prison was while he was serving a sentence for the killing were not probative on the issue of defendant's credibility.

Additionally, the questions regarding how defendant received his scars insinuated defendant had committed a rape against his ex-wife after he committed the murder and escaped from prison before serving his sentence. Each of these facts was highly inflammatory and had no probative value as to defendant's credibility.

Compounding this error was the prosecutor's closing argument. The prosecutor relied heavily during closing argument upon defendant's admission to shooting another and killing him. As the prosecutor noted several times throughout his closing argument, the case was one of credibility. After reiterating that defendant shot and killed another in 1997, was sentenced to 14 years, and escaped after seven years of his sentence, the prosecutor argued: "So keep that in mind when you're evaluating who you're going to believe, Celso or the defendant, who has killed in the past. Who are you going to believe?" Shortly thereafter, he made the point again: "So Celso Ambriz versus somebody who has killed in [the] past. That is the issue." After recounting Josue's testimony, the prosecutor argued, "But, again, evaluate the testimony and weigh it against the defendant and the defendant's credibility, who was an escaped prisoner from Mexico after killing somebody." After arguing the evidence did not establish Celso and defendant knew each other, the prosecutor stated:

> "Then this defendant testified. What did we have? We had lies, lies, and more lies.

> "Again, I cannot emphasize this more. This case comes down to Celso and the defendant, who are you going to believe, and that's it.

> "Celso, really no motive to lie, no motive to lie whatsoever versus the credibility of the defendant, an escaped killer. That is the credibility.

> "That credibility is key, because we know he told you on the stand that in 1997 he killed Leonardo Galvan. That's what he told you. He tried to down play it. He tried to say, no, self-defense.

> "He tried to down play it, but we know from his own testimony, you heard it read to you in a [t]ape recorded interview or videotaped tape recorded interview, no less, that somebody didn't think it was self-defense. He got 14 years for that."

36.

Later, after discussing defendant's statements to the police emphasizing he often changes his version, the prosecutor argued:

> "The person that's going to change the version cannot be trusted. Credibility should be shot. That's just another factor to add to why the defendant has no credibility, in addition to the fact that that he escaped from prison, in addition to the fact he killed Leonardo Galvan in 1987 [*sic*]. In addition to those facts he says he will change the version."

The prosecutor goes on to argue that defendant is not "this poor, uneducated man," explaining:

> "That's not the case. That does not apply. We know this is not his first encounter with law enforcement.

> "According to his own testimony we have the killing in '97. He said he was sentenced to 14 years for drug dealing in Mexico. He has his DUI from Tulare. This is not his first encounter with law enforcement. He knows the routine."

Immediately thereafter, the prosecutor explained defendant knew about guns:

> "In fact, another point that the defendant said was I don't know anything about guns. He kept saying that. I don't know how many times he said that to you.

> "Can you believe someone that says I don't know anything about guns when in that audiotaped [*sic*] videotaped recording he said in 1997 he killed Leonardo Galvan. What did he say about it? He said because I had a better gun.

> "He tried to downplay it, but he said to tell detectives I had a better gun and luck was on my side.

> "Someone with a better gun? Does that sound like somebody who doesn't know anything about the guns. That's what it was put forward for was to show you the defendant was lying again."

The prosecutor brings up the theme again:

> "… He says he doesn't know anything about guns so we put on some more detail about the killing of Leonardo Galvan from 1997—better gun. Again, weigh that in your own minds.

"It comes down to this. You must—the simplest form again is who are you going to believe, Celso or the defendant.

"Celso, no motive to lie. Celso, setting this guy up because of a $300 debt in 1993 or that going to work for the DEA in 1997, 11 years prior or the defendant, escapee, killed Leonardo Galvan, an admitted liar, a person that he's going to—admitted person that said I'll change the version if I have to. That's the simplest form in this case."

In conclusion of his argument, the prosecutor stated:

"So, ladies and, gentlemen with that I ask you to look at this case in its simplest form. Look at Celso Ambriz, look at the defendant, and evaluate the credibility.

"Are you going to believe Celso Ambriz to lie or the defendant, someone who has escaped prison after killing Leonardo Galvan in 1997?

"I ask you to return a verdict of guilty."

The above references to defendant's prior homicide were made over the prosecutor's relatively brief closing argument.[9] The argument highlighted that defendant was a "killer" who had escaped punishment. The repeated characterization of defendant as an escaped killer, although couched in terms of credibility, heightened the likelihood that the jury would use the information as evidence of defendant's predisposition to kill. Indeed, as our Supreme Court has recognized,

"Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

In general, character evidence is inadmissible not "'because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.'" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1171-1172.) Based

---

[9]The argument consisted of 27 pages.

on the evidence as admitted here, coupled with the fact that the jury was informed it could consider the prior misconduct as to defendant's character for possessing firearms, the risk of the jury using the evidence for defendant's criminal propensity was great.

The People argue any error was harmless because the evidence against defendant was "very strong" and defendant's credibility was significantly impeached at trial. Although defendant was clearly impeached during his testimony, we note that Celso, the primary witness against defendant, was also impeached through cross-examination. According to Celso's testimony, he did not know defendant, however, defendant came to his home, walked up to the porch, and immediately offered Celso a drink that he accepted. The only other witness who corroborated Celso's testimony that the shooter approached the porch was Diaz. However, Diaz did not initially tell the police he had witnessed the shooting, and it was not until four years later that he informed law enforcement he had seen the shooter approach the porch. Diaz also admitted he was using methamphetamine at the time and had significant memory problems.

The defense strongly disputed Celso's testimony that the shooter ever approached the porch, and defendant testified he had visited Celso earlier in the day and brought him the bottle to explain the presence of his fingerprints and DNA on the bottle. Evidence was introduced establishing (1) defendant and Celso were, in fact, related, (2) both had visited Mexico at the same time and attended a family celebration, (3) defendant and Celso were seen together in a chance meeting on the street, and (4) defendant was living in a home with Celso's niece at the time of the shooting.

No physical evidence tied defendant to the shooting, no prints were found on the shell casings, defendant was never linked to the vehicle used in the shooting, no gun was discovered, and no evidence was admitted demonstrating defendant knew or had any motive to kill the victim. Thus, the evidence was based on the relative credibility of defendant and Celso. Given the admission of the highly inflammatory evidence— branding defendant as a killer who escaped his punishment only to commit a rape against

39.

his former wife—we cannot say it is not reasonably probable defendant would have received a more favorable verdict had the evidence not been admitted. Consequently, we must reverse the judgment.

## DISPOSITION

The judgment is reversed and the case is remanded for a new trial.

_____

PEÑA, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

DETJEN, J.